# HESS ET AL. *v.* PORT AUTHORITY TRANS-HUDSON CORPORATION

No. 93–1197.   Argued October 3, 1994—Decided November 14, 1994

GINSBURG, J., delivered the opinion of the Court, in which STEVENS, KENNEDY, SOUTER, and BREYER, JJ., joined. STEVENS, J., filed a concurring opinion, *post,* p. 53. O'CONNOR, J., filed a dissenting opinion, in which REHNQUIST, C. J., and SCALIA and THOMAS, JJ., joined, *post,* p. 55.

*Lawrence A. Katz* argued the cause for petitioners. With him on the briefs were *Joseph A. Coffey, Jr.,* and *David J. Bederman.*

*Hugh H. Welsh* argued the cause for respondent. With him on the brief were *Arthur P. Berg, Donald F. Burke,* and *Anne M. Tannenbaum.*\*

JUSTICE GINSBURG delivered the opinion of the Court.

These paired cases arise out of work-related accidents in which a locomotive engineer and a train conductor, employees of a bistate railway authorized by interstate compact, sustained personal injuries. The courts below—the United States District Court for the District of New Jersey, and the United States Court of Appeals for the Third Circuit—rejected both complaints on the ground that the Eleventh Amendment sheltered respondent railway from suit in federal court. We granted certiorari to resolve an intercircuit conflict on this issue. 510 U. S. 1190 (1994). Concluding that respondent bistate railway, the Port Authority Trans-Hudson Corporation (PATH), is not cloaked with the Elev-

---

\**William G. Mahoney* and *L. Pat Wynns* filed a brief for the Railway Labor Executives' Association as *amicus curiae* urging reversal.

Briefs of *amici curiae* urging affirmance were filed for the State of New Jersey et al. by *Deborah T. Poritz,* Attorney General of New Jersey, *Andrea M. Silkowitz, Robert H. Stoloff,* and *Mary Jacobson,* Assistant Attorneys General, and *Eldad Philip Isaac,* Deputy Attorney General, joined by the Attorneys General for their respective jurisdictions as follows: *G. Oliver Koppell* of New York, *James H. Evans* of Alabama, *Winston Bryant* of Arkansas, *Gale A. Norton* of Colorado, *Richard Blumenthal* of Connecticut, *Michael J. Bowers* of Georgia, *Robert A. Marks* of Hawaii, *Larry EchoHawk* of Idaho, *Roland W. Burris* of Illinois, *Pamela Carter* of Indiana, *Robert T. Stephen* of Kansas, *Chris Gorman* of Kentucky, *Richard P. Ieyoub, Jr.,* of Louisiana, *J. Joseph Curran, Jr.,* of Maryland, *Scott Harshbarger* of Massachusetts, *Hubert H. Humphrey III* of Minnesota, *Mike Moore* of Mississippi, *Joseph P. Mazurek* of Montana, *Frankie Sue Del Papa* of Nevada, *Tom Udall* of New Mexico, *Michael F. Easley* of North Carolina, *Lee Fisher* of Ohio, *Susan B. Loving* of Oklahoma, *Theodore R. Kulongoski* of Oregon, *Ernest D. Preate, Jr.,* of Pennsylvania, *T. Travis Medlock* of South Carolina, *Mark Barnett* of South Dakota, *Jeffrey L. Amestoy* of Vermont, *James S. Gilmore III* of Virginia, and *James E. Doyle* of Wisconsin; and for the Council of State Governments et al. by *Richard Ruda* and *Clifton S. Elgarten.*

enth Amendment immunity that a State enjoys, we reverse the judgment of the Third Circuit.

## I

## A

Petitioners Albert Hess and Charles F. Walsh, both railroad workers, were injured in unrelated incidents in the course of their employment by PATH. PATH, a wholly owned subsidiary of the Port Authority of New York and New Jersey (Port Authority or Authority), operates a commuter railroad connecting New York City to northern New Jersey. In separate personal injury actions commenced in the United States District Court for the District of New Jersey, petitioners sought to recover damages for PATH's alleged negligence; both claimed a right to compensation under the federal law governing injuries to railroad workers, the Federal Employers' Liability Act (FELA), 35 Stat. 65, as amended, 45 U. S. C. § 51 *et seq.*[1] Hess and Walsh filed their complaints within the 3-year time limit set by the FELA, see 35 Stat. 66, as amended, 45 U. S. C. § 56, but neither petitioner met the 1-year limit specified in the States' statutory consent to sue the Port Authority. See N. J. Stat. Ann. §§ 32:1–157, 32:1–163 (West 1990); N. Y. Unconsol. Laws §§ 7101, 7107 (McKinney 1979).

PATH moved to dismiss each action, asserting (1) PATH's qualification as a state agency entitled to the Eleventh Amendment immunity from suit in federal court enjoyed by New York and New Jersey,[2] and (2) petitioners' failure to

---

[1] Hess additionally invoked the Boiler Inspection Act, ch. 103, 36 Stat. 913, as amended, 45 U. S. C. § 22 *et seq.*, as a basis for his claim for damages.

[2] The Eleventh Amendment provides:

"The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

commence court proceedings within the 1-year limit prescribed by New York and New Jersey. Third Circuit precedent concerning the Port Authority supported PATH's plea. In *Port Authority Police Benevolent Assn., Inc.* v. *Port Authority of New York and New Jersey,* 819 F. 2d 413 *(Port Authority PBA),* cert. denied, 484 U. S. 953 (1987), the Court of Appeals for the Third Circuit held that the Port Authority is "an agency of the state and is thus entitled to Eleventh Amendment immunity." 819 F. 2d, at 418. In reaching this decision, the Court of Appeals acknowledged that "[g]iven the solvency and size of the [Port Authority's] General Reserve Fund, it is unlikely that the Authority would have to go to the state to get payment for any liabilities issued against it." *Id.,* at 416.[3] But the Third Circuit considered "crystal clear" the intentions of New York and New Jersey: "[I]f the Authority is ever in need of financial support, the states will be there to provide it." *Ibid.*

In line with *Port Authority PBA,* the District Court held in the *Hess* and *Walsh* actions that PATH enjoys Eleventh Amendment immunity, and could be sued in federal court only within the 1-year time frame New York and New Jersey allowed. See *Walsh,* 813 F. Supp. 1095, 1096–1097 (NJ 1993); *Hess,* 809 F. Supp. 1172, 1178–1182 (NJ 1992). Accordingly, both actions were dismissed.

The District Court in *Hess* noted an anomaly: Had Hess sued in a New Jersey or New York *state* court the FELA's 3-year limitation period, not the States' 1-year prescription, would have applied. See *id.,* at 1183–1185, and n. 16. This followed from our reaffirmation in *Hilton* v. *South Carolina Public Railways Comm'n,* 502 U. S. 197 (1991), that the *entire* federal scheme of railroad regulation—including all FELA terms—applies to all railroads, even those wholly

---

[3] The court referred to the Port Authority of New York and New Jersey Comprehensive Annual Financial Report 42–44 (1985), which shows that the Authority's General Reserve Fund had a balance of over $271 million at the end of 1985.

owned by one State. Time-bar rejection by a federal court of a federal statutory claim that federal prescription would have rendered timely, had the case been brought in state court, becomes comprehensible, the District Court explained, once it is recognized that "'the Eleventh Amendment does not apply in state courts.'" *Hess*, 809 F. Supp., at 1183–1184 (quoting *Hilton*, 502 U. S., at 205); see 809 F. Supp., at 1185, n. 16.

Consolidating *Hess* and *Walsh* on appeal, the Third Circuit summarily affirmed the District Court's judgments. 8 F. 3d 811 (1993) (table).

### B

The Port Authority, whose Eleventh Amendment immunity is at issue in these cases, was created in 1921, when Congress, pursuant to the Constitution's Interstate Compact Clause,[4] consented to a compact between the Authority's parent States. 42 Stat. 174. Through the bistate compact, New York and New Jersey sought to achieve "a better coordination of the terminal, transportation and other facilities of commerce in, about and through the port of New York." N. J. Stat. Ann. § 32:1–1 (West 1990); N. Y. Unconsol. Law § 6401 (McKinney 1979). The compact grants the Port Authority power to

> "purchase, construct, lease and/or operate any terminal or transportation facility within [the Port of New York D]istrict; and to make charges for the use thereof; and for any of such purposes to own, hold, lease and/or operate real or personal property, to borrow money and secure the same by bonds or by mortgages upon any property held or to be held by it." N. J. Stat. Ann. § 32:1–7

---

[4] Article I, § 10, cl. 3, of the Constitution provides:

"No State shall, without the Consent of Congress, lay any Duty of Tonnage, keep Troops, or Ships of War in time of Peace, enter into any Agreement or Compact with another State, or with a foreign Power, or engage in War, unless actually invaded, or in such imminent Danger as will not admit of delay."

(West 1990); accord, N. Y. Unconsol. Law § 6407 (McKinney 1979).

The Port Authority's domain, the Port of New York District, is a defined geographic area that embraces New York Harbor, including parts of New York and New Jersey. See N. J. Stat. Ann. § 32:1–3 (West 1990); N. Y. Unconsol. Law § 6403 (McKinney 1979).[5]

"The Port Authority was conceived as a financially independent entity, with funds primarily derived from private investors." *United States Trust Co. of N. Y.* v. *New Jersey*, 431 U. S. 1, 4 (1977). Tolls, fees, and investment income account for the Authority's secure financial position. See App. to Pet. for Cert. 60a–61a.[6]

Twelve commissioners, six selected by each State, govern the Port Authority. See N. J. Stat. Ann. §§ 32:1–5, 32:12–3 (West 1990); N. Y. Unconsol. Law § 6405 (McKinney 1979); 1930 N. Y. Laws, ch. 422, § 6. Each State may remove, for cause, the commissioners it appoints. See N. J. Stat. Ann. §§ 32:1–5, 32:12–5 (West 1990); N. Y. Unconsol. Law § 6405 (McKinney 1979); 1930 N. Y. Laws, ch. 422, § 4. Consonant with the Authority's geographic domain, four of New York's six commissioners must be resident voters of New York City, and four of New Jersey's must be resident voters of the New Jersey portion of the Port of New York District. See N. J. Stat. Ann. § 32:1–5 (West 1990); N. Y. Unconsol. Law § 6405 (McKinney 1979). The Port Authority's commissioners also serve as PATH's directors. See N. J. Stat. Ann. § 32:1–35.61 (West 1990); N. Y. Unconsol. Law § 6612 (McKinney 1979).

---

[5] See also N. J. Stat. Ann. § 32:2–23.28(j) (West 1990) (defining larger area in which Port Authority has obligation to supply commuter buses to authorized operators); N. Y. Unconsol. Law § 7202(10) (McKinney Supp. 1994) (same).

[6] At the end of 1993, the Port Authority had over $2.8 billion in net assets and $534 million in its General Reserve Fund. See Port Authority of New York and New Jersey, Comprehensive Annual Financial Report 49, 64 (1993) (hereinafter 1993 Annual Financial Report).

The Governor of each State may veto actions of the Port Authority commissioners from that State, including actions taken as PATH directors. See N. J. Stat. Ann. §§ 32:1–17, 32:1–35.61, 32:2–6 to 32:2–9 (West 1990); N. Y. Unconsol. Law §§ 6417, 6612, 7151–7154 (McKinney 1979). Acting jointly, the state legislatures may augment the powers and responsibilities of the Port Authority, see N. J. Stat. Ann. § 32:1–8 (West 1990); N. Y. Unconsol. Law § 6408 (McKinney 1979), and specify the purposes for which the Port Authority's surplus revenues are used. See N. J. Stat. Ann. § 32:1–35.142 (West 1990); N. Y. Unconsol. Law § 7002 (McKinney 1979).

Debts and other obligations of the Port Authority are not liabilities of the two founding States, and the States do not appropriate funds to the Authority. The compact and its implementing legislation bar the Port Authority from drawing on state tax revenue, pledging the credit of either State, or otherwise imposing any charge on either State. See N. J. Stat. Ann. §§ 32:1–8, 32:1–33 (West 1990); N. Y. Unconsol. Law §§ 6408, 6459 (McKinney 1979).

The States did agree to appropriate sums to cover the Authority's "salaries, office and other administrative expenses," N. J. Stat. Ann. § 32:1–16 (West 1990); N. Y. Unconsol. Law § 6416 (McKinney 1979), but this undertaking is notably modest.[7] By its terms, it applies only "until the revenues from operations conducted by the [P]ort [A]uthority are adequate to meet all expenditures." The promise of support has a low ceiling: $100,000 annually from each State. Thus, the States in no way undertake to cover the bulk of the Author-

---

[7] Compact article XV, the provision for expense coverage, reads in full:

"Unless and until the revenues from operations conducted by the [P]ort [A]uthority are adequate to meet all expenditures, the legislatures of the two states shall appropriate, in equal amounts, annually, for the salaries, office and other administrative expenses, such sum or sums as shall be recommended by the [P]ort [A]uthority and approved by the governors of the two states, but each state obligates itself hereunder only to the extent of one hundred thousand dollars in any one year." N. J. Stat. Ann. § 32:1–16 (West 1990); N. Y. Unconsol. Law § 6416 (McKinney 1979).

ity's operating and capital expenses. Further, even the limited administrative expense payments for which the States provided are contingent on the advance approval of both Governors, see *ibid.*, and the States' treasuries may not be tapped until both legislatures have appropriated the necessary funds. See N. J. Stat. Ann. § 32:1–18 (West 1990); N. Y. Unconsol. Law § 6418 (McKinney 1979). A judgment against PATH, it is thus apparent, would not be enforceable against either New York or New Jersey.

## C

The Third Circuit's assessment of PATH's qualification for Eleventh Amendment immunity conflicts with the judgment of the Court of Appeals for the Second Circuit on the same matter. See *Feeney* v. *Port Authority Trans-Hudson Corporation*, 873 F. 2d 628, 631 (1989), aff'd on other grounds, 495 U. S. 299 (1990). The Second Circuit concluded:

"No provision [of the compact or of state legislation pursuant to the compact] commits the treasuries of the two states to satisfy judgments against the Port Authority . . . . We believe that this insulation of state treasuries from the liabilities of the Port Authority outweighs both the methods of appointment and gubernatorial veto so far as the Eleventh Amendment immunity is concerned." 873 F. 2d, at 631.

We affirmed the Second Circuit's judgment in *Feeney*, but we bypassed the question whether PATH enjoyed the States' Eleventh Amendment immunity. See *Port Authority Trans-Hudson Corp.* v. *Feeney*, 495 U. S. 299 (1990). Assuming, *arguendo*, that the suit in *Feeney* was tantamount to a claim against the States,[8] we ruled that New York and New

---

[8] Our assumption was in accord with prior state and federal decisions typing the Port Authority a state arm or agency. See, *e. g.*, *Howell* v. *Port of New York Authority*, 34 F. Supp. 797, 801 (NJ 1940); *Trippe* v. *Port of New York Authority*, 14 N. Y. 2d 119, 123, 198 N. E. 2d 585, 586

Jersey had effectively consented to the litigation. See *id.*, at 306–309 (relying on N. J. Stat. Ann. §§ 32:1–157, 32:1–162 (West 1963); N. Y. Unconsol. Laws §§ 7101, 7106 (McKinney 1979)). Consent is not arguable here, because Hess and Walsh commenced suit too late to meet the 1-year prescription specified by the States. See *supra*, at 33. Accordingly, we confront directly the sole question petitioners Hess and Walsh present, and we hold that PATH is not entitled to Eleventh Amendment immunity from suit in federal court.

## II

The Eleventh Amendment largely shields States from suit in federal court without their consent, leaving parties with claims against a State to present them, if the State permits, in the State's own tribunals. Adoption of the Amendment responded most immediately to the States' fears that "federal courts would force them to pay their Revolutionary War debts, leading to their financial ruin." *Pennhurst State School and Hospital* v. *Halderman*, 465 U. S. 89, 151 (1984) (STEVENS, J., dissenting); see also *Petty* v. *Tennessee-Missouri Bridge Comm'n*, 359 U. S. 275, 276, n. 1 (1959); *Missouri* v. *Fiske*, 290 U. S. 18, 27 (1933).[9] More pervasively, current Eleventh Amendment jurisprudence emphasizes the integrity retained by each State in our federal system:

> "The Amendment is rooted in a recognition that the States, although a union, maintain certain attributes of sovereignty, including sovereign immunity. See *Hans*

---

(1964); *Miller* v. *Port of New York Authority*, 18 N. J. Misc. 601, 606, 15 A. 2d 262, 266 (Sup. Ct. 1939).

[9] As Chief Justice John Marshall recounted: "[A]t the adoption of the [C]onstitution, all the States were greatly indebted; and the apprehension that these debts might be prosecuted in the federal Courts" prompted swift passage of the Eleventh Amendment. *Cohens* v. *Virginia*, 6 Wheat. 264, 406 (1821). See generally 1 C. Warren, The Supreme Court in United States History 96–102 (1922).

v. *Louisiana*, 134 U. S. 1, 13 (1890). It thus accords the States the respect owed them as members of the federation." *Puerto Rico Aqueduct and Sewer Authority* v. *Metcalf & Eddy, Inc.*, 506 U. S. 139, 146 (1993).

Bistate entities occupy a significantly different position in our federal system than do the States themselves. The States, as separate sovereigns, are the constituent elements of the Union. Bistate entities, in contrast, typically are creations of three discrete sovereigns: two States and the Federal Government.[10] Their mission is to address "'interests and problems that do not coincide nicely either with the national boundaries or with State lines'"—interests that "'may be badly served or not served at all by the ordinary channels of National or State political action.'" V. Thursby, Interstate Cooperation: A Study of the Interstate Compact 5 (1953) (quoting National Resources Committee, Regional Factors in National Planning and Development 34 (1935)); see Grad, Federal-State Compact: A New Experiment in Cooperative Federalism, 63 Colum. L. Rev. 825, 854–855 (1963) (Compact Clause entities formed to deal with "broad, region-wide problems" should not be regarded as "an affirmation of a narrow concept of state sovereignty," but as "independently functioning parts of a regional polity and of a national union.").

A compact accorded congressional consent "is more than a supple device for dealing with interests confined within a region. . . . [I]t is also a means of safeguarding the national interest . . . ." *West Virginia ex rel. Dyer* v. *Sims*, 341 U. S. 22, 27 (1951). The Port Authority of New York and New Jersey exemplifies both the need for, and the utility of, Compact Clause entities:

---

[10] If the creation of a bistate entity does not implicate federal concerns, however, federal consent is not required. See *Virginia* v. *Tennessee*, 148 U. S. 503, 517–520 (1893).

"From the point of view of geography, commerce, and engineering, the Port of New York is an organic whole. Politically, the port is split between the law-making of two States, independent but futile in their respective spheres. The scarcity of land and mounting commerce have concentrated on the New York side of the Hudson River the bulk of the terminal facilities for foreign commerce, while it has made the Jersey side, to a substantial extent, the terminal and breaking-up yards for the east- and west-bound traffic. In addition, both sides of the Hudson are dotted with municipalities, who have sought to satisfy their interest in the general problem through a confusion of local regulations. In addition, the United States has been asserting its guardianship over interstate and foreign commerce. What in fact was one, in law was many. Plainly the situation could not be adequately dealt with except through the coordinated efforts of New York, New Jersey, and the United States. The facts presented a problem for the unified action of the law-making of these three governments, and law heeded facts." Frankfurter & Landis, The Compact Clause of the Constitution—A Study in Interstate Adjustments, 34 Yale L. J. 685, 697 (1925) (footnote omitted).

Suit in federal court is not an affront to the dignity of a Compact Clause entity, for the federal court, in relation to such an enterprise, is hardly the instrument of a distant, disconnected sovereign; rather, the federal court is ordained by one of the entity's founders. Nor is the integrity of the compacting States compromised when the Compact Clause entity is sued in federal court. As part of the federal plan prescribed by the Constitution, the States agreed to the power sharing, coordination, and unified action that typify

Compact Clause creations.[11] Again, the federal tribunal cannot be regarded as alien in this cooperative, trigovernmental arrangement. This is all the more apparent here, where the very claims in suit—the FELA claims of Hess and Walsh—arise under federal law. See *supra*, at 33.

Because Compact Clause entities owe their existence to state and federal sovereigns acting cooperatively, and not to any "one of the United States," see *supra*, at 33, n. 2, their political accountability is diffuse; they lack the tight tie to the people of one State that an instrument of a single State has:

> "An interstate compact, by its very nature, shifts a part of a state's authority to another state or states, or to the agency the several states jointly create to run the compact. Such an agency under the control of special interests or gubernatorially appointed representatives is two or more steps removed from popular control, or even of control by a local government." M. Ridgeway, Interstate Compacts: A Question of Federalism 300 (1971).

In sum, within any single State in our representative democracy, voters may exercise their political will to direct state policy; bistate entities created by compact, however, are not subject to the unilateral control of any one of the States that compose the federal system.

Accordingly, there is good reason not to amalgamate Compact Clause entities with agencies of "one of the United States" for Eleventh Amendment purposes. This Court so recognized in *Lake Country Estates, Inc.* v. *Tahoe Regional Planning Agency,* 440 U. S. 391 (1979), the only case, prior

---

[11] See *Port Authority Trans-Hudson Corp.* v. *Feeney,* 495 U. S. 299, 314–316 (1990) (Brennan, J., concurring in part and concurring in judgment) (observing that no single State has dominion over an entity created by interstate compact and that state/federal shared power is the essential attribute of such an entity); M. Ridgeway, Interstate Compacts: A Question of Federalism 297–300 (1971) (emphasizing limits of individual State's authority over interstate compact entities).

to this one, in which we decided whether a bistate entity qualified for Eleventh Amendment immunity.[12]

*Lake Country* rejected a plea that the Tahoe Regional Planning Agency (TRPA), an agency created by compact to which California and Nevada were parties, acquired the immunity which the Eleventh Amendment accords to each one of TRPA's parent States. TRPA had argued that if the Amendment shields each State, then surely it must shield an entity "so important that it could not be created by [two] States without a special Act of Congress." *Id.*, at 400. That "expansive reading," we said, was not warranted, for the Amendment specifies "the State" as the entity protected:

> "By its terms, the protection afforded by [the Eleventh] Amendment is only available to 'one of the United States.' It is true, of course, that some agencies exercising state power have been permitted to invoke the Amendment in order to protect the state treasury from liability that would have had essentially the same practical consequences as a judgment against the State itself. But the Court has consistently refused to construe the Amendment to afford protection to political subdivisions such as counties and municipalities, even though such entities exercise a 'slice of state power.'" *Id.*, at 400–401 (footnotes omitted).

We then set out a general approach: We would presume the Compact Clause agency does not qualify for Eleventh Amendment immunity "[u]nless there is good reason to believe that the States structured the new agency to enable it to enjoy the special constitutional protection of the States

---

[12] *Petty* v. *Tennessee-Missouri Bridge Comm'n*, 359 U. S. 275, 279, 281–282 (1959), and *Feeney*, 495 U. S., at 308–309, also involved Eleventh Amendment pleas by bistate agencies; we upheld the exercise of federal-court jurisdiction in both cases on the ground that the asserted immunity from suit had been waived.

themselves, and that Congress concurred in that purpose."
*Id.*, at 401.

The Court in *Lake Country* found "no justification for
reading additional meaning into the limited language of the
Amendment." Indeed, all relevant considerations in that
case weighed against TRPA's plea. The compact called
TRPA a "political subdivision," and required that the major-
ity of the governing members be county and city appointees.
*Ibid.* Obligations of TRPA, the compact directed, "shall *not*
be binding on either State." TRPA's prime function, we
noted, was regulation of land use, a function traditionally
performed by local governments. Further, the agency's
performance of that function gave rise to the litigation.
Moreover, rules made by TRPA were "not subject to veto at
the state level." *Id.*, at 402.

This case is more complex. Indicators of immunity or the
absence thereof do not, as they did in *Lake Country*, all point
the same way. While 8 of the Port Authority's 12 commis-
sioners must be resident voters of either New York City or
other parts of the Port of New York District,[13] this indicator
of local governance is surely offset by the States' controls.
All commissioners are state appointees. Acting alone, each
State through its Governor may block Port Authority meas-
ures; and acting together, both States, through their legisla-
tures, may enlarge the Port Authority's powers and add to
its responsibilities.

The compact and its implementing legislation do not type
the Authority as a state agency; instead they use various
terms: "joint or common agency";[14] "body corporate and poli-

---

[13] Cf. *Farias* v. *Bexar Cty. Bd. of Trustees for Mental Health Mental
Retardation Servs.*, 925 F. 2d 866, 875 (CA5) (entity held autonomous, and
thus not shielded by Eleventh Amendment, where board members had to
be "qualified voters of the region"), cert. denied, 502 U. S. 866 (1991).

[14] N. J. Stat. Ann. § 32:1–1 (West 1990); N. Y. Unconsol. Law § 6401 (Mc-
Kinney 1979).

tic"; [15] "municipal corporate instrumentality of the two states for the purpose of developing the port and effectuating the pledge of the states in the . . . compact." [16]  State courts, however, repeatedly have typed the Port Authority an agency of the States rather than a municipal unit or local district.  See, *e. g., Whalen* v. *Wagner,* 4 N. Y. 2d 575, 581–583, 152 N. E. 2d 54, 56–57 (1958) (legislation authorizing specific Port Authority projects does not pertain to the "property, affairs or government" of a city because "the matters over which the Port Authority has jurisdiction are of State concern").

Port Authority functions are not readily classified as typically state or unquestionably local.  States and municipalities alike own and operate bridges, tunnels, ferries, marine terminals, airports, bus terminals, industrial parks, also commuter railroads. [17]  This consideration, therefore, does not advance our Eleventh Amendment inquiry.

Pointing away from Eleventh Amendment immunity, the States lack financial responsibility for the Port Authority. Conceived as a fiscally independent entity financed predominantly by private funds, see *United States Trust Co. of N. Y.* v. *New Jersey,* 431 U. S., at 4, the Authority generates its own revenues, and for decades has received no money from the States.  See *Commissioner* v. *Shamberg's Estate,* 144 F. 2d 998, 1002 (CA2 1944) ("In the compact . . . the states agreed to make annual appropriations (not in excess of $100,000 for each state) for expenses of the Authority until

[15] N. J. Stat. Ann. § 32:1–4 (West 1990); N. Y. Unconsol. Law § 6404 (McKinney 1979); accord, N. J. Stat. Ann. § 32:1–7 (West 1990); N. Y. Unconsol. Law § 6407 (McKinney 1979).

[16] N. J. Stat. Ann. § 32:1–33 (West 1990); N. Y. Unconsol. Law § 6459 (McKinney 1979).

[17] Other Authority facilities, such as the World Trade Center, an office complex housing numerous private tenants, see 1993 Annual Financial Report 33–35, and the Teleport, a satellite communications center, see *id.,* at 30, are not typically operated by either States or municipalities.

[r]evenues from its operations were sufficient to meet its expenses. These annual appropriations were discontinued in 1934 because the revenues from the bridges, the Holland Tunnel and Inland Terminal had become sufficient."), cert. denied, 323 U. S. 792 (1945).

The States, as earlier observed, bear no legal liability for Port Authority debts; they are not responsible for the payment of judgments against the Port Authority or PATH. The Third Circuit, in *Port Authority PBA*, assumed that, "if the Authority is ever in need," the States would pay. 819 F. 2d, at 416. But nothing in the compact or the laws of either State supports that assumption. See *supra*, at 37–38. As the Second Circuit concisely stated:

> "The Port Authority is explicitly barred from pledging the credit of either state or from borrowing money in any name but its own. Even the provision for the appropriation of moneys for administrative expenses up to $100,000 per year requires prior approval by the governor of each state and an actual appropriation before obligations for such expenses may be incurred. Moreover, the phrase 'salaries, office and other administrative expenses' clearly limits this essentially optional obligation of the two states to a very narrow category of expenses and thus also evidences an intent to insulate the states' treasuries from the vast bulk of the Port Authority's operating and capital expenses, including personal injury judgments." *Feeney*, 873 F. 2d, at 631.[18]

---

[18] Concerning the Third Circuit's decision in *Port Authority PBA*, the Second Circuit said:

"That decision . . . was based on the Third Circuit's understanding that, in the event that 'a judgment were entered against the Authority that was serious enough to deplete its resources, the Authority would be able to go to the state legislatures in order to recoup the amount needed for its operating expenses.' To the extent that this statement implies that the states *must* make such an appropriation, it appears to be in error." *Feeney*, 873 F. 2d, at 632 (quoting *Port Authority PBA*, 819 F. 2d, at 416).

## III

When indicators of immunity point in different directions, the Eleventh Amendment's twin reasons for being remain our prime guide. See *supra*, at 39–40. We have already pointed out that federal courts are not alien to a bistate entity Congress participated in creating. Nor is it disrespectful to one State to call upon the Compact Clause entity to answer complaints in federal court. See *supra*, at 41–43. Seeing no genuine threat to the dignity of New York or New Jersey in allowing Hess and Walsh to pursue FELA claims against PATH in federal court, we ask, as *Lake Country* instructed, whether there is here "good reason to believe" the States and Congress designed the Port Authority to enjoy Eleventh Amendment immunity. 440 U. S., at 401.

PATH urges that we find good reason to classify the Port Authority as a state agency for Eleventh Amendment purposes based on the control New York and New Jersey wield over the Authority. The States appoint and can remove the commissioners, the Governors can veto Port Authority actions, and the States' legislatures can determine the projects the Port Authority undertakes. See *supra*, at 36–37. But ultimate control of every state-created entity resides with the State, for the State may destroy or reshape any unit it creates. "[P]olitical subdivisions exist solely at the whim and behest of their State," *Feeney*, 495 U. S., at 313 (Brennan, J., concurring in part and concurring in judgment), yet cities and counties do not enjoy Eleventh Amendment immunity. See, *e. g.*, *Mt. Healthy City Bd. of Ed.* v. *Doyle*, 429 U. S. 274, 280 (1977); *Lincoln County* v. *Luning*, 133 U. S. 529, 530 (1890). Moreover, no one State alone can control the course of a Compact Clause entity. See *supra*, at 42, and n. 11. Gauging actual control, particularly when an entity has multiple creator-controllers, can be a "perilous inquiry," "an uncertain and unreliable exercise." See Note, 92 Colum. L. Rev. 1243, 1284 (1992); see also *id.*, at 1302, and n. 264 (describing "degree to which the state controls the

entity" as a criterion neither "[i]ntelligible" nor "judicially manageable").

Moreover, rendering control dispositive does not home in on the impetus for the Eleventh Amendment: the prevention of federal-court judgments that must be paid out of a State's treasury. See Fletcher, A Historical Interpretation of the Eleventh Amendment, 35 Stan. L. Rev. 1033, 1129 (1983) (identifying "the award of money judgments against the states" as "the traditional core of eleventh amendment protection").[19]  Accordingly, Courts of Appeals have recognized the vulnerability of the State's purse as the most salient factor in Eleventh Amendment determinations. See, e. g., *Baxter* v. *Vigo Cty. School Corp.*, 26 F. 3d 728, 732–733 (CA7 1994) (most significant factor is whether entity has power to raise its own funds); *Hutsell* v. *Sayre*, 5 F. 3d 996, 999 (CA6 1993) ("The most important factor . . . is whether any monetary judgment would be paid out of the state treasury."), cert. denied, 510 U. S. 1119 (1994); *Metcalf & Eddy, Inc.* v. *Puerto Rico Aqueduct and Sewer Authority*, 991 F. 2d 935, 942–943 (CA1 1993) ("First, and most fundamentally, [the entity's] inability to tap the Commonwealth treasury or pledge the Commonwealth's credit leaves it unable to exercise the power of the purse. On this basis, [the entity] is ill-deserving of Eleventh Amendment protection."); *Bolden* v. *Southeastern Pa. Transp. Authority*, 953 F. 2d 807, 818 (CA3 1991) (in banc) ("[T]he 'most important' factor is 'whether any judgment would be paid from the state treasury.'") (quoting *Fitchik* v. *New Jersey Transit Rail Operations, Inc.*, 873 F. 2d 655, 659 (CA3) (in banc), cert. denied, 493 U. S. 850 (1989)), cert. denied, 504 U. S. 943 (1992); *Bar-*

---

[19] The dissent questions whether the driving concern of the Eleventh Amendment is the protection of state treasuries, emphasizing that the Amendment covers "any suit in law *or equity.*" *Post*, at 60. The suggestion that suits in equity do not drain money as frightfully as actions at law, however, is belied by the paradigm case. See *Jarndyce and Jarndyce* (Charles Dickens, Bleak House (1853)).

ket, *Levy & Fine, Inc.* v. *St. Louis Thermal Energy Corp.*,
948 F. 2d 1084, 1087 (CA8 1991) ("Because Missouri and Illinois are not liable for judgments against Bi-State, there is
no policy reason for extending the states' sovereign immunity to Bi-State."); *Feeney* v. *Port Authority Trans-Hudson
Corporation*, 873 F. 2d, at 631 ("In cases where doubt has
existed as to the availability of Eleventh Amendment immunity, the Supreme Court has emphasized the exposure of the
state treasury as a critical factor."), aff'd on other grounds,
495 U. S. 299 (1990); *Jacintoport Corp.* v. *Greater Baton
Rouge Port Comm'n*, 762 F. 2d 435, 440 (CA5 1985) ("One of
the most important goals of the immunity of the Eleventh
Amendment is to shield states' treasuries. . . . The purpose of
the immunity therefore largely disappears when a judgment
against the entity does not entail a judgment against the
state."), cert. denied, 474 U. S. 1057 (1986). In sum, as New
York and New Jersey concede, the "vast majority of Circuits
. . . have concluded that the state treasury factor is the most
important factor to be considered . . . and, in practice, have
generally accorded this factor dispositive weight." Brief for
States of New Jersey, New York et al. as *Amici Curiae*
18–19.

The Port Authority's anticipated and actual financial independence—its long history of paying its own way, see *supra*,
at 37–38, and n. 7, 45–46—contrasts with the situation of
transit facilities that place heavy fiscal tolls on their founding
States. In *Alaska Cargo Transport, Inc.* v. *Alaska R.
Corp.*, 5 F. 3d 378 (CA9 1993), for example, Eleventh Amendment immunity was accorded a thinly capitalized railroad
that depends for its existence on a state-provided "financial
safety net of broad dimension." *Id.*, at 381. And in *Morris*
v. *Washington Metropolitan Area Transit Authority*, 781
F. 2d 218 (CADC 1986), Eleventh Amendment immunity was
accorded an interstate transit system whose revenue shortfall Congress and the cooperating States anticipated from
the start, an enterprise constantly dependent on funds from

the participating governments to meet its sizable operating deficits. See *id.*, at 225–227. As the *Morris* court concluded: "[W]here an agency is so structured that, as a practical matter, if the agency is to survive, a judgment must expend itself against state treasuries, common sense and the rationale of the eleventh amendment require that sovereign immunity attach to the agency." *Id.*, at 227.[20] There is no such requirement where the agency is structured, as the Port Authority is, to be self-sustaining. Cf. *Royal Caribbean Corp.* v. *Puerto Rico Ports Authority*, 973 F. 2d 8, 10–11 (CA1 1992) (Breyer, C. J.) (rejecting Eleventh Amendment immunity plea, despite Commonwealth's control over agency's executives, planning, and administration, where agency did not depend on Commonwealth financing for its income and covered its own expenses, including judgments against it).

PATH maintains that the Port Authority's private funding and financial independence should be assessed differently. Operating profitably, the Port Authority dedicates at least some of its surplus to public projects which the States themselves might otherwise finance. As an example, PATH notes a program under which the Port Authority purchases buses and then leases or transfers them without charge to public and private transportation entities in both States. See N. J. Stat. Ann. §§ 32:2–23.27 to 32:2–23.42 (West 1990); N. Y. Unconsol. Laws §§ 7201–7217 (McKinney Supp. 1994); 1993 Annual Financial Report 66. A judgment against the Port Authority, PATH contends, by reducing the Authority's surplus available to fund such projects, produces an effect equivalent to the impact of a judgment directly against the State. It follows, PATH suggests, that distinguishing the

---

[20] The decision in *Morris* is compatible with our approach. See *supra*, at 43–44. Thus, we establish no "*per se*" rule that the Eleventh Amendment never applies when States act in concert." *Post*, at 56 (O'CONNOR, J., dissenting).

fiscal resources of the Port Authority from the fiscal resources of the States is unrealistic and artificial.

This reasoning misses the mark. A charitable organization may undertake rescue or other good work which, in its absence, we would expect the State to shoulder. But none would conclude, for example, that in times of flood or famine the American Red Cross, to the extent it works for the public, acquires the States' Eleventh Amendment immunity.[21] The proper focus is not on the use of profits or surplus, but rather is on losses and debts. If the expenditures of the enterprise exceed receipts, is the State in fact obligated to bear and pay the resulting indebtedness of the enterprise? When the answer is "No"—both legally and practically— then the Eleventh Amendment's core concern is not implicated.

## IV

The conflict between the Second and Third Circuits, it bears emphasis, is no longer over the correct legal theory. Both Circuits, in accord with the prevailing view, see *supra*, at 48–49, identify "the 'state treasury' criterion—whether any judgment must be satisfied out of the state treasury—as the most important consideration" in resolving an Eleventh Amendment immunity issue. Brief for States of New Jersey, New York et al. as *Amici Curiae* 2 (acknowledging, but opposing, this widely held view). The intercircuit division thus persists only because the Second and Third Circuits diverge in answering the question: Are the Port Authority's debts those of its parent States? See *ibid.*

Two Third Circuit decisions issued after *Port Authority PBA*, both rejecting Eleventh Amendment pleas by public

---

[21] It would indeed heighten a "myster[y] of legal evolution" were we to spread an Eleventh Amendment cover over an agency that consumes no state revenues but contributes to the State's wealth. See Borchard, Government Liability in Tort, 34 Yale L. J. 1, 4 (1924); see also *Muskopf* v. *Corning Hospital Dist.*, 55 Cal. 2d 211, 213–216, and n. 1, 359 P. 2d 457, 458–460, and n. 1 (1961) (Traynor, J.).

transit authorities, indicate the narrow compass of the current Circuit split. In *Bolden* v. *Southeastern Pa. Transp. Authority,* 953 F. 2d 807 (1991) (in banc), cert. denied, 504 U. S. 943 (1992), the Third Circuit held a regional transit authority not entitled to Eleventh Amendment immunity from suit, under 42 U. S. C. § 1983, in federal court. The "most important question," according to Circuit precedent, the Court of Appeals confirmed, was "whether any judgment would be paid from the state treasury." 953 F. 2d, at 816 (internal quotation marks omitted). Earlier, in *Fitchik* v. *New Jersey Transit Rail Operations, Inc.,* 873 F. 2d 655 (in banc), cert. denied, 493 U. S. 850 (1989), an FELA suit, the Third Circuit concluded that the New Jersey Transit Corporation did not share the State's Eleventh Amendment immunity. As in *Bolden,* the court in *Fitchik* called "most important" the question "whether any judgment would be paid from the state treasury." 873 F. 2d, at 659.

Accounting for *Port Authority PBA* in its later *Bolden* decision, the Third Circuit acknowledged that it had relied primarily on the interstate compact provision calling for state contributions unless Port Authority revenues were "'adequate to meet all expenditures.'" See *Bolden,* 953 F. 2d, at 815 (quoting compact article XV, set out *supra,* at 37, n. 7). As earlier indicated, however, see *supra,* at 37–38 and 46, the Third Circuit drew from the compact expense coverage provision far more than the text of that provision warrants.

\*      \*      \*

A discrete entity created by constitutional compact among three sovereigns, the Port Authority is financially self-sufficient; it generates its own revenues, and it pays its own debts. Requiring the Port Authority to answer in federal court to injured railroad workers who assert a federal statutory right, under the FELA, to recover damages does not touch the concerns—the States' solvency and dignity—that underpin the Eleventh Amendment. The judgment of the

Court of Appeals is accordingly reversed, and the *Hess* and *Walsh* cases are remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS, concurring.

JUSTICE GINSBURG's thorough opinion demonstrates why the Court's answer to the open question this case presents is entirely faithful to precedent. I join her opinion without reservation, but believe it appropriate to identify an additional consideration that has motivated my vote.

Most of this Court's Eleventh Amendment jurisprudence is the product of judge-made law unsupported by the text of the Constitution. The Amendment provides as follows:

> "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

As Justice Brennan explained in his dissent in *Atascadero State Hospital* v. *Scanlon,* 473 U. S. 234, 259–302 (1985), this language, when read in light of the historical evidence, is properly understood to mean that the grant of diversity jurisdiction found in Article III, § 2, does not extend to actions brought by individuals against States. See also *Welch* v. *Texas Dept. of Highways and Public Transp.,* 483 U. S. 468, 509–516 (1987) (Brennan, J., dissenting). Yet since *Hans* v. *Louisiana,* 134 U. S. 1 (1890), the Court has interpreted the Eleventh Amendment as injecting broad notions of sovereign immunity into the whole corpus of federal jurisdiction. The Court's decisions have given us "two Eleventh Amendments," one narrow and textual and the other—not truly a constitutional doctrine at all—based on prudential considerations of comity and federalism. See *Pennsylvania* v. *Union Gas Co.,* 491 U. S. 1, 23–29 (1989) (STEVENS, J., concurring).

54

This Court's expansive Eleventh Amendment jurisprudence is not merely misguided as a matter of constitutional law; it is also an engine of injustice. The doctrine of sovereign immunity has long been the subject of scholarly criticism.[1] And rightly so, for throughout the doctrine's history, it has clashed with the just principle that there should be a remedy for every wrong. See, *e. g., Marbury* v. *Madison,* 1 Cranch 137, 163 (1803). Sovereign immunity inevitably places a lesser value on administering justice to the individual than on giving government a license to act arbitrarily.

Arising as it did from the peculiarities of political life in feudal England, 1 F. Pollock & F. Maitland, History of English Law 515–518 (2d ed. 1909), sovereign immunity is a doctrine better suited to a divinely ordained monarchy than to our democracy.[2] Chief Justice John Jay recognized as much over two centuries ago. See *Chisholm* v. *Georgia,* 2 Dall. 419, 471–472 (1793). Despite the doctrine's genesis in judicial decisions, ironically it has usually been the Legislature that has seen fit to curtail its reach. See Scalia, Sovereign Immunity and Nonstatutory Review of Federal Administrative Action: Some Conclusions from the Public-Lands Cases, 68 Mich. L. Rev. 867, 867–868 (1970).

In my view, when confronted with the question whether a judge-made doctrine of this character should be extended or contained, it is entirely appropriate for a court to give

---

[1] See, *e. g.,* Borchard, Government Liability in Tort, 34 Yale L. J. 1 (1924); Davis, Sovereign Immunity Must Go, 22 Admin. L. Rev. 383 (1970). The criticism has not abated in recent years, but rather has focused on this Court's adherence to an unjustifiably broad interpretation of the Eleventh Amendment. See, *e. g.,* Marshall, Fighting the Words of the Eleventh Amendment, 102 Harv. L. Rev. 1342 (1989); Jackson, The Supreme Court, the Eleventh Amendment, and State Sovereign Immunity, 98 Yale L. J. 1 (1988); Amar, Of Sovereignty and Federalism, 96 Yale L. J. 1425 (1987).

[2] Stevens, Is Justice Irrelevant?, 87 Nw. U. L. Rev. 1121, 1124–1125 (1993).

controlling weight to the Founders' purpose to "establish Justice." [3]   Today's decision is faithful to that purpose.

JUSTICE O'CONNOR, with whom THE CHIEF JUSTICE, JUSTICE SCALIA, and JUSTICE THOMAS join, dissenting.

The Court's opinion, as I read it, makes two different points.   First, an interstate compact entity is presumptively not entitled to immunity under the Eleventh Amendment, because the States surrendered any such entitlement "[a]s part of the federal plan prescribed by the Constitution." *Ante,* at 41.   When States act in concert under the Interstate Compact Clause, they cede power to each other and to the Federal Government, which, by consenting to the state compact, becomes one of the compact entity's creators.   As such, each individual State lacks meaningful control over the entity, and suits against the entity in federal court pose no affront to a State's "dignity."   *Ibid.*   Second, in place of the various factors recognized in *Lake Country Estates, Inc.* v. *Tahoe Regional Planning Agency,* 440 U. S. 391 (1979), for determining arm-of-the-state status, we may now substitute a single overriding criterion, vulnerability of the state treasury.   If a State does not fund judgments against an entity, that entity is not within the ambit of the Eleventh Amendment, and suits in federal court may proceed unimpeded. By the Court's reckoning, the state treasury is not implicated on these facts.   Neither, it follows, is the Eleventh Amendment.

I disagree with both of these propositions and with the ultimate conclusion the Court draws from them.   The Eleventh Amendment, in my view, clothes this interstate entity with immunity from suit in federal courts.

---

[3] "We the People of the United States, in Order to form a more perfect Union, establish Justice . . . do ordain and establish this Constitution for the United States of America."   U. S. Const. Preamble.

## I

Despite several invitations, this Court has not as yet had occasion to find an interstate entity shielded by the Eleventh Amendment from suit in federal court. See *Port Authority Trans-Hudson Corp.* v. *Feeney,* 495 U. S. 299 (1990) (assuming Eleventh Amendment applies, but finding waiver); *Lake Country, supra* (finding no reason to believe entity was arm of the State); *Petty* v. *Tennessee-Missouri Bridge Comm'n,* 359 U. S. 275 (1959) (same as *Feeney*). As I read its opinion, the Court now builds upon language in *Lake Country* to create what looks very much like a *per se* rule that the Eleventh Amendment never applies when States act in concert. To be sure, the Court leaves open the possibility that in certain undefined situations, we might find " 'good reason' " to confer immunity where States structure an entity to enjoy immunity and we see evidence that " 'Congress concurred in that purpose.' " *Ante,* at 43–44, quoting *Lake Country, supra,* at 401. But the crux of the Court's analysis rests on its apparent belief that the States ceded their sovereignty in the interstate compact context in the plan of the convention. See *ante,* at 41–42 ("As part of the federal plan prescribed by the Constitution, the States agreed to the power sharing, coordination, and unified action that typify Compact Clause creations"). Such broad reasoning brooks few, if any, exceptions.

In reaching its conclusion, the Court attaches undue significance to the requirement that Congress consent to interstate compacts. Admittedly, the consent requirement performs an important function in our federal scheme. In *Cuyler* v. *Adams,* 449 U. S. 433 (1981), we observed that " 'the requirement that Congress approve a compact is to obtain its political judgment: Is the agreement likely to interfere with federal activity in the area, is it likely to disadvantage other States to an important extent, is it a matter that would better be left untouched by state and federal regulation?' " *Id.,* at 440, n. 8, quoting *United States Steel*

*Corp.* v. *Multistate Tax Comm'n,* 434 U. S. 452, 485 (1978) (White, J., dissenting). But the consent clause neither transforms the nature of state power nor makes Congress a full-fledged participant in the underlying agreement; it requires *only* that Congress "check any infringement of the rights of the national government." J. Story, Commentaries on the Constitution of the United States § 1403, p. 264 (T. Cooley ed. 1873). In consenting, Congress certifies that the States are acting within their boundaries in our federal scheme and that the national interest is not offended. Once Congress consents to cooperative state activity, there is no reason to presume that immunity does not attach. Sovereign immunity, after all, inheres in the permissible exercise of state power. "If congress consent[s], then the states [are] in this respect restored to their original inherent sovereignty; such consent being the sole limitation imposed by the constitution, when given, [leaves] the states as they were before . . . ." *Rhode Island* v. *Massachusetts,* 12 Pet. 657, 725 (1838); see also L. Tribe, American Constitutional Law § 6–33, p. 523 (2d ed. 1988).

Even if the Court were correct that the States ceded a portion of their power to Congress in ratifying the consent provision, it would not logically or inevitably follow that any particular entity receives no immunity under the Eleventh Amendment. In *Fitzpatrick* v. *Bitzer,* 427 U. S. 445, 455–456 (1976), we held that the States surrendered a portion of their sovereign authority to Congress in ratifying § 5 of the Fourteenth Amendment. Despite this, we have consistently required " 'an unequivocal expression of congressional intent to overturn the constitutionally guaranteed immunity of the several States'" before allowing suits against States to proceed in federal court. *Atascadero State Hospital* v. *Scanlon,* 473 U. S. 234, 240 (1985), quoting *Pennhurst State School and Hospital* v. *Halderman,* 465 U. S. 89, 99 (1984). Assuming, *arguendo,* that States ceded power to Congress to abrogate States' Eleventh Amendment immunity in the

interstate compact realm, our precedents caution that we should be reluctant to infer abrogation in the absence of clear signals from Congress that such a result was, in fact, intended. At the least, I would presume the applicability of the Eleventh Amendment to interstate entities unless Congress clearly and expressly indicates otherwise.

The Court ignores these abrogation cases, however, in favor of exactly the opposite presumption. By the Court's reckoning, the Eleventh Amendment is inapplicable unless we have "good reason" to believe that Congress affirmatively *concurs* in a finding of immunity. In other words, the baseline is no immunity, even if the State has structured the entity in the expectation that immunity will inhere. If, however, Congress manifests a contrary intent, the Eleventh Amendment shields an interstate entity from suit in federal court. Congress, therefore, effectively may dictate the applicability of the Eleventh Amendment in this context. The notion that Congress possesses this power, an extension of dictum in *Lake Country*, 440 U. S., at 401, has little basis in our precedents. Congress may indeed be able to confer on the States what in fact *looks* a lot like Eleventh Amendment immunity; but we have never held that Eleventh Amendment immunity itself attaches at the whim of Congress.

The Court shores up its analysis by observing that each State lacks meaningful power to control an interstate entity. As an initial matter, one wonders how important this insight actually is to the Court's conclusion, given that the opinion elsewhere disclaims reliance on a control inquiry. *Ante,* at 47–48. In any event, that we may sometimes, or even often, in the application of arm-of-the-state analysis, find too attenuated a basis for immunity does not mean we should presume such immunity *altogether* lacking in this context. Two sovereign States acting together may, in most situations, be as deserving of immunity as either State acting apart. I see no reason to vary the analysis for interstate and intrastate entities.

## II

The Court wisely recognizes that the six-factor test set forth in *Lake Country, supra,* ostensibly a balancing scheme, provides meager guidance for lower courts when the factors point in different directions. Without any indication from this Court as to the weight to ascribe particular criteria, the Courts of Appeals have struggled, variously adding factors, see *Puerto Rico Ports Authority* v. *M/V Manhattan Prince,* 897 F. 2d 1, 9 (CA1 1990) (considering seven factors), distilling factors, see *Benning* v. *Board of Regents of Regency Universities,* 928 F. 2d 775, 777 (CA7 1991) (considering four factors), and deeming certain factors dispositive, compare *Brown* v. *East Central Health Dist.,* 752 F. 2d 615, 617–618 (CA11 1985) (finding state treasury factor determinative), with *Tuveson* v. *Florida Governor's Council on Indian Affairs, Inc.,* 734 F. 2d 730, 732 (CA11 1984) (suggesting that state courts' characterization of entity is most important criterion). See generally Note, Clothing State Governmental Entities with Sovereign Immunity: Disarray in the Eleventh Amendment Arm-of-the-State Doctrine, 92 Colum. L. Rev. 1243 (1992) (summarizing diffuse responses).

In light of this confusion, the Court's effort to focus the *Lake Country* analysis on a single overarching principle is admirable. But its conclusion that the vulnerability of the state treasury is determinative has support neither in our precedents nor in the literal terms of the Eleventh Amendment. The Court takes a *sufficient* condition for Eleventh Amendment immunity, and erroneously transforms it into a *necessary* condition. In so doing, the Court seriously reduces the scope of the Eleventh Amendment, thus underprotecting the state sovereignty at which the Eleventh Amendment is principally directed. See *Puerto Rico Aqueduct and Sewer Authority* v. *Metcalf & Eddy, Inc.,* 506 U. S. 139, 146 (1993) ("The Amendment is rooted in a recognition that the States, although a union, maintain certain attributes of sovereignty, including sovereign immunity"); *Atascadero*

*State Hospital* v. *Scanlon, supra,* at 238 ("[T]he significance of this Amendment 'lies in its affirmation that the fundamental principle of sovereign immunity limits the grant of judicial authority in Art. III' of the Constitution") (citation omitted).

The Court's assertion that the driving concern of the Eleventh Amendment is protection of state treasuries, see *ante,* at 48–49, is belied by the text of the Amendment itself. The Eleventh Amendment bars federal jurisdiction over "any suit in law *or equity*" against the States. As we recognized in *Cory* v. *White,* 457 U. S. 85, 91 (1982), the Eleventh Amendment "by its terms" clearly extends beyond actions seeking money damages. "It would be a novel proposition indeed that the Eleventh Amendment does not bar a suit to enjoin the State itself simply because no money judgment is sought." *Id.,* at 90. While it may be clear that *Chisholm* v. *Georgia,* 2 Dall. 419 (1793), a money damages action, gave initial impetus to the effort to amend the Constitution, it is equally clear that the product of that effort, the Eleventh Amendment itself, extends far beyond the *Chisholm* facts. Recognizing this, we have long held that the Eleventh Amendment bars suits against States and state entities *regardless* of the nature of relief requested. See *Puerto Rico Aqueduct and Sewer Authority* v. *Metcalf & Eddy, Inc., supra,* at 145–146; *Cory, supra,* at 90–91; *Alabama* v. *Pugh,* 438 U. S. 781, 782 (1978).

The Court *is* entirely right, however, to suggest that the Eleventh Amendment confers immunity over entities whose liabilities are funded by state taxpayer dollars. If a State were vulnerable at any time to retroactive damages awards in federal court, its ability to set its own agenda, to control its own internal machinery, and to plan for the future—all essential perquisites of sovereignty—would be grievously impaired. I have no quarrel at all with the many cases cited by the Court for the proposition that *if* an entity's bills will be footed by the State, the Eleventh Amendment clearly pre-

cludes the exercise of federal jurisdiction. See, *e. g., Hutsell* v. *Sayre,* 5 F. 3d 996, 999 (CA6 1993) (liability of university tantamount to claim against state treasury); *In re San Juan Dupont Plaza Hotel Fire Litigation,* 888 F. 2d 940, 943–944 (CA1 1989) (70–75% of funds provided by taxpayer dollars).

But the converse cannot also be true. The Eleventh Amendment does not turn a blind eye simply because the state treasury is *not* directly implicated. In my view, the proper question is whether the State possesses sufficient *control* over an entity performing governmental functions that the entity may properly be called an extension of the State itself. Such control can exist even where the State assumes no liability for the entity's debts. We have always respected state flexibility in setting up and maintaining agencies charged with furthering state objectives. See, *e. g., Highland Farms Dairy, Inc.* v. *Agnew,* 300 U. S. 608, 612 (1937) ("How power shall be distributed by a state among its governmental organs is commonly, if not always, a question for the state itself"). An emphasis on control, rather than impact on the state treasury, adequately protects state managerial prerogatives while retaining a crucial check against abuse. So long as a State's citizens may, if sufficiently aggravated, vote out an errant government, Eleventh Amendment immunity remains a highly beneficial provision of breathing space and vindication of state sovereignty.

An arm of the State, to my mind, is an entity that undertakes state functions and is politically accountable to the State, and by extension, to the electorate. The critical inquiry, then, should be whether and to what extent the elected state government exercises oversight over the entity. If the lines of oversight are clear and substantial—for example, if the State appoints and removes an entity's governing personnel and retains veto or approval power over an entity's undertakings—then the entity should be deemed an arm of the State for Eleventh Amendment purposes. This test is sufficiently elastic to encompass the Court's treasury fac-

tor. It will be a rare case indeed where the state treasury foots the bill for an entity's wrongs but fails to exercise a healthy degree of oversight over that entity. But the control test goes further than the Court's single factor in assuring state governments the critical flexibility in internal governance that is essential to sovereign authority. See Note, 92 Colum. L. Rev., at 1246–1252 (describing structural innovations among state governments).

The Court dismisses consideration of control altogether, *ante*, at 47–48, noting that States wield ultimate power over cities and counties, units that have never been accorded Eleventh Amendment immunity. See *Lincoln County* v. *Luning*, 133 U. S. 529, 530 (1890). This criticism, based on a supposed line-drawing problem, is off the mark. That "political subdivisions exist solely at the whim and behest of their State," *Port Authority Trans-Hudson Corp.* v. *Feeney*, 495 U. S., at 313 (Brennan, J., concurring), does not mean that state governments actually exercise sufficient oversight to trigger Eleventh Amendment immunity under a control-centered formulation. The inquiry should turn on real, immediate control and oversight, rather than on the potentiality of a State taking action to seize the reins. Virtually every enterprise, municipal or private, flourishes in some sense at the behest of the State. But we have never found the Eleventh Amendment's protections to hinge on this sort of abstraction. The control-centered formulation necessarily looks to the structure and function of state law. If the State delegates control and oversight of an entity to municipalities under state law, the requisite state-level control is lacking, and the Eleventh Amendment does not shield the entity from suit in federal court.

### III

Turning to the instant case, I believe that sufficient indicia of control exist to support a finding of immunity for the Port Authority, and hence, for the PATH. New Jersey and New

York each select and may remove 6 of the Port Authority's 12 commissioners. See N. J. Stat. Ann. § 32:1–5 (West 1990); N. Y. Unconsol. Law § 6405 (McKinney 1979). The Governors of each State may veto the actions of that State's commissioners. See N. J. Stat. Ann. § 32:1–17 (West 1990); N. Y. Unconsol. Law § 6417 (McKinney 1979). The quorum requirements specify that "no action of the port authority shall be binding unless taken at a meeting at which at least three of the members from each state are present, and unless a majority of the members from each state present at such meeting but in any event at least three of the members from each state shall vote in favor thereof." N. J. Stat. Ann. § 32:1–17 (West 1990); N. Y. Unconsol. Law § 6417 (McKinney 1979). Accordingly, each Governor's veto power is tantamount to a full veto power over the actions of the Commission. The Port Authority must make annual reports to the state legislatures, which in turn must approve changes in the Port Authority's rules and any new projects. See N. J. Stat. Ann. § 32:1–8 (West 1990); N. Y. Unconsol. Law § 6408 (McKinney 1979). Each State, and by extension, each State's electorate, exercises ample authority over the Port Authority. Without setting forth a shopping list of considerations that govern the control inquiry, suffice it to say that in this case, the whole is exactly the sum of its parts. I would hold that the Eleventh Amendment shields the PATH and Port Authority from suits in federal court. I respectfully dissent.