**David LEWIS, Plaintiff,**

v.

**NORTHERN INDIANA COMMUTER TRANSPORTATION DISTRICT, Defendant.**

**No. 94 CV 6144.**

United States District Court, N.D. Illinois, Eastern Division.

June 26, 1995.

Louis C. Cairo; Edward W. Pinok, Goldberg, Weisman and Cairo, Ltd., Chicago, IL, for plaintiff.

Edward Henry MacCabe, Maureen Ann McGuire, Margaret Theresa Conway, MacCabe & McGuire, Chicago, IL, for defendant.

### MEMORANDUM AND ORDER

MORAN, Chief Judge.

David Lewis brings this action against the Northern Indiana Commuter Transportation District (NICTD or the District), seeking damages for injuries he suffered while employed by the District. NICTD has moved to dismiss the complaint for lack of jurisdiction or, in the alternative, to transfer the

case to the Northern District of Indiana. For the reasons set forth below, the motion to dismiss is granted and the motion to transfer is denied.

## FACTS [1]

■ NICTD is an Indiana municipal corporation comprised of four Indiana counties. It operates a railroad that runs from Chicago, Illinois, to South Bend, Indiana, passing through the four counties. It is not a Compact Clause entity. On February 21, 1993, while working as a carman for NICTD, Lewis was on his way to disengage a car from a commuter train when he slipped and fell on an icy stairway, injuring his back, leg, and foot. He claims that the District's negligent failure to maintain a reasonably safe workplace by not keeping the stairway free of ice caused his injuries.

NICTD argues that because it is an agency of the State of Indiana, the Eleventh Amendment renders it immune from suit in federal court and deprives us of jurisdiction over this action.[2] In the alternative, it asks us to transfer the case to the Northern District of Indiana. Lewis responds that NICTD is not immune from suit because the Federal Employers' Liability Act (FELA) covers all railroads, public or private, and, in any event, the Eleventh Amendment is inapplicable because NICTD is not a state agency. He also asserts that venue is proper here.

## DISCUSSION

Lewis' first argument in response to NICTD's motion to dismiss is easily set aside. He claims that because FELA covers "every common carrier by railroad," whether the carrier is state-owned or not, it does not matter whether the District is an arm of the State of Indiana, a political subdivision of the state, or a private entity. However NICTD is characterized, Lewis says, he is "entitled to every right and protection granted by [FELA]" (Pl.Resp. at 3).

In effect, Lewis' argument is that NICTD is not entitled to Eleventh Amendment immunity from suit in federal court because FELA abrogates state sovereign immunity. He claims that *Parden v. Terminal Railway of Alabama Docks Department*, 377 U.S. 184, 84 S.Ct. 1207, 12 L.Ed.2d 233 (1964), and *Hilton v. South Carolina Public Railways Commission*, 502 U.S. 197, 112 S.Ct. 560, 116 L.Ed.2d 560 (1991), support this position. We disagree, finding that Lewis misreads the cases.

■ In *Parden*, the Supreme Court held that Congress made FELA applicable to state-owned railroads, as well as private ones, and that in so doing Congress intended to abrogate the states' Eleventh Amendment immunity. 377 U.S. at 187–89, 84 S.Ct. at 1210–12. But the abrogation aspect of *Parden* was overruled in *Welch v. Texas Department of Highways and Public Transportation*, 483 U.S. 468, 107 S.Ct. 2941, 97 L.Ed.2d 389 (1987). Recognizing that "*Parden*'s discussion of congressional intent to negate Eleventh Amendment immunity is no longer good law," the *Welch* Court held that "to the extent that *Parden* ... is inconsistent with the [new] requirement that an abrogation of Eleventh Amendment immunity by Congress must be expressed in unmistakably clear language, it is overruled." *Id.* at 478, 107 S.Ct. at 2948. Thus FELA, which lacks the required language, did not abrogate the states' sovereign immunity. *Hilton*, the other case Lewis cites, addressed an issue left untouched in *Welch*: the viability of *Parden*'s

1. In ruling on a motion to dismiss, "[w]e view all of the facts alleged in the complaint, as well as any inferences reasonably drawn from them, in the light most favorable to the plaintiff." *Caldwell v. City of Elwood*, 959 F.2d 670, 671 (7th Cir.1992). Therefore we recite Lewis' version of the facts.

2. The Eleventh Amendment provides that "[t]he judicial power of the United States shall not be construed to extend to any suit in law or in equity, commenced or prosecuted against any one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. Although on its face the amendment does not apply to suits by citizens against their own states, it has been construed to encompass such cases as well. *Port Authority Trans–Hudson Corp. v. Feeney*, 495 U.S. 299, 304, 110 S.Ct. 1868, 1872, 109 L.Ed.2d 264 (1990) (state that does not consent to suit in federal court is immune from suits by its own citizens).

statutory interpretation holding.[3] But it did not disturb *Welch*'s conclusion that FELA does not abrogate state sovereign immunity. In fact, the *Hilton* Court's statement that "to confer immunity from state-court suit would strip all FELA ... protection from workers employed by the States" indicates that no federal court suit is available against state-owned railroads. *Hilton,* 502 U.S. at 202, 112 S.Ct. at 564.

Thus, although *Parden*'s holding that state-owned railroads can be sued under FELA survived *Welch* and *Hilton,* that holding does not support Lewis' argument here. After all, the District acknowledges that it can be sued under FELA. The issue is whether such a suit can be brought in federal court.

■■■ Our resolution of that issue depends on whether NICTD is a state agency. If it is, it is entitled to immunity from suit in federal court under the Eleventh Amendment. If not, we can take jurisdiction over Lewis' case. Precedent indicates that in deciding whether an entity is immune from suit, we must determine whether it "is more like a county or city [or more] like an arm of the State." *Mount Healthy City School District v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 572, 50 L.Ed.2d 471 (1977) (local school board resembled a county or city more than an arm of the state); *see also Kashani v. Purdue University,* 813 F.2d 843, 845 (7th Cir.) (state university resembled an arm of the state more than a city or county), *cert. denied,* 484 U.S. 846, 108 S.Ct. 141, 98 L.Ed.2d 97 (1987). Our guidepost in making that determination is *Kashani,* a section 1983 case in which Purdue University successfully invoked immunity under the Eleventh Amendment.[4] *Kashani* sets forth three factors for us to consider: "the extent of the entity's financial autonomy from the state," its "general legal status," and "whether it serve[s] the state as a whole or only a region." 813 F.2d at 845–47. We address each in turn.

## A. *Financial Independence*

■■■ An entity's financial autonomy is the most important of the three factors. *Id.* at 845; *see also Hess v. Port Authority Trans–Hudson Corp.,* —— U.S. ——, ——–––——, 115 S.Ct. 394, 404–06, 130 L.Ed.2d 245 (1994) (explaining that financial independence is the most important factor because "the prevention of federal court judgments that must be paid out of a State's treasury," *id.,* 115 S.Ct. at 404, is the Eleventh Amendment's impetus and core concern). In evaluating autonomy, courts consider "the extent of state funding, the state's oversight and control of the [entity's] fiscal affairs, the [entity's] ability independently to raise funds, whether the state taxes the [entity], and whether a judgment against the [entity] would result in the state increasing its appropriations to the [entity]." *Id.* at 845.

In *Kashani,* Purdue received 36 percent of its income from state appropriations. Indiana paid close attention to the university's finances, requiring it to submit a detailed statement of expenditures made in each budgetary period and anticipated in the next period, including an explanation of any requested increase in state appropriations. The state budget agency analyzed Purdue's statements and presented its findings to the legislature. The Indiana Commission for Higher Education also reviewed appropriation requests and made recommendations. Purdue had no power to levy taxes, which in the *Kashani* court's view "ensure[d] [the university's] ultimate reliance upon the state." *Id.* at 846. Similarly, although Purdue could issue bonds, it was not authorized to do so in order to satisfy a judgment against it. Finally, the *Kashani* court noted that although "the state treasury would not write out a check" if a judgment were awarded against Purdue, "it is apparent that the payment [of such a judgment] would directly affect the state treasury" because "Purdue is by design

---

**3.** The *Hilton* Court upheld this aspect of *Parden* under the doctrine of *stare decisis.* 502 U.S. at 202, 112 S.Ct. at 564.

**4.** Plaintiff urges upon us several cases from the Third Circuit, most notably *Fitchik v. New Jersey Transit Rail Operations,* 873 F.2d 655 (3d Cir.),

*cert. denied,* 493 U.S. 850, 110 S.Ct. 148, 107 L.Ed.2d 107 (1989). In this circuit, however, we are constrained to view *Mount Healthy City School District, supra,* through the prism of *Kashani,* not *Fitchik.*

dependent on state appropriations, which are evidently geared through close oversight to meet the changing financial needs of the university." *Id.*

NICTD receives approximately 62 percent of its revenues from passenger fares and parking fees. Most of the rest comes from state funding and from federal grants for which state funding is a prerequisite. It receives no funding from the cities, towns, and counties that it serves.

NICTD's fiscal affairs are not directly controlled by the state, but (like Purdue's) they are monitored, and the limits placed on the District's ability to generate revenues increase the state's ability to control its finances indirectly. For example, although NICTD collects passenger fares and parking fees, it has no authority to levy taxes. Ind. Code § 8–5–15–5(b). And although it has the power to issue bonds, the power is a limited one. The bonds it issues are subject to the approval of the state Department of Transportation and must be payable solely from the revenues of the District. Ind.Code §§ 8–5–15–5.4(g), 8–5–15–5(a)(14). Bond proceeds may be used only for the payment of railroad projects and any surplus must be deposited in a bond sinking fund. *Id.* §§ 8–5–15–11(a)(1), (c).[5]

Finally, a judgment against NICTD in this case might well result in an increase in state appropriations. As noted above, the District receives much of its funding from the state (whether directly or through federal grants linked to state appropriations) and cannot use bond proceeds to satisfy judgments against it. Therefore, we can say of NICTD what *Kashani* said of Purdue: although the state treasury would not write out a check to satisfy a judgment against NICTD, "in view

of the fact that [NICTD] is by design dependent on state appropriations, which are evidently geared through close oversight to meet [its] changing financial needs ..., it is apparent that the payment would directly affect the state treasury." 813 F.2d at 846.[6]

### B. *General Legal Status*

■ The second factor we must take into account is " 'the nature of the entity created by state law.' " *Id.* at 847 (quoting *Mount Healthy*, 429 U.S. at 280, 97 S.Ct. at 572). This factor includes considerations such as the statutory definition of the entity, the origin of the members of its governing body, the powers the entity has, and whether those powers derive from an independent source or are merely delegated by the state. *Id.*

In *Kashani*, the Seventh Circuit found Indiana statutes unhelpful: they "sometimes define[d] Purdue as a state agency, sometimes as a political subdivision." *Id.* More informative was the substance of Purdue's legal status. The court thought it "[v]ery significant" that seven of the ten members of the university's board of trustees were selected by the governor. *Id.* Thus, although the board had extensive authority to govern university affairs, "that [was] undercut by the fact that the majority of [its] members [were] selected by the chief executive officer of the state." *Id.* Moreover, the legislature retained the authority to amend or revoke the trustees' powers, so those powers "appear[ed] less like the independent powers of a city or county than like the authority delegated to an instrumentality of the state to spare the legislature the need to ratify its every action." *Id.*

---

**5.** Like Purdue, NICTD is exempt from state tax. Ind.Code § 8–5–15–16. However, as *Kashani* pointed out, this consideration is not very important here, as Indiana taxes neither political subdivisions nor arms of the state. 813 F.2d at 846.

**6.** We note that this conclusion is supported by the affidavits of two NICTD officials. *See* Brezene Aff. at 3 ("While the District does have cash in a claims reserve fund in an amount of approximately $1.8 million, this fund is also responsible for coverage of the self insured portion of 165 claims (including 7 fatalities) arising out of [a] collision on January 18, 1993, and other inci-

dents. Current fare and subsidy levels are insufficient to provide a replenishment source for this fund. In the event that existing reserves are insufficient to cover pending claims or are exhausted through payment of claims, the District will have to seek additional funds directly from the State of Indiana to pay claims or replenish the reserve account."); Dovenbarger Aff. at 2 ("[A]ny judgment or settlement will be paid in part with funds either supplied directly by the State or funds made available through the use of state funds.").

As in *Kashani*, the Indiana statutes applicable to this case do not conclusively resolve the question of whether NICTD is an agency of the state or an independent entity. The legislation establishing commuter transportation districts describes them as municipal corporations, Ind.Code § 8–5–15–2, and the Indiana Tort Claims Act (ITCA) defines them as political subdivisions. Ind.Code § 34–4–16.5–2. But Purdue is also a political subdivision under the ITCA, *id.*, and in any event *Kashani* requires us to look to the substance of the entity's legal status rather than its form. 813 F.2d at 847.

NICTD's governing body is comprised of nine members. Of those, eight represent the four member counties and one is selected by the governor of Indiana. Clearly, the District's board is not as closely controlled by the state as Purdue's. Nonetheless, the state subjects it to substantial oversight in other ways. The state attorney general must approve any legal services it obtains, the Department of Transportation reviews its finances and operations, and the state board of accounts audits its books.

NICTD's powers are not as general as those exercised by a city or county. It cannot levy taxes, has limited powers to issue bonds, and can act only in the narrow sphere of railroad operations. In light of these limits and the oversight exercised by the state, it is apparent that the District's powers, unlike those of a city or county, do not derive from an independent source but are delegated to it by the state.

Other evidence reinforces the conclusion that NICTD is best characterized as a state agency. Board members receive per diem allowances at the standard state rate and their travel expenses are reimbursed only if state travel policies and procedures have been met. Moreover, although an earlier provision that allowed the legislature to dissolve NICTD at any time has been repealed, a statutory note refers the reader to Ind. Code §§ 2–5–21–1 to –19 (Chapter 21), which covers "Legislative Evaluation of Oversight of Agencies and Programs." The fact that the District is covered under that chapter, which requires a committee of the legislature to evaluate state agencies and recommend changes (which may include abolishing the agency), reveals that the legislature considers it a state agency. Similarly, § 8–5–15–5(d), which mandates that the state receive 90 percent of the proceeds if NICTD is dissolved and the member counties only 10 percent, suggests that the District is first and foremost a state institution.

### C. Area of Service

The third and final factor we must consider is the entity's area of service, *i.e.*, whether it serves "the state as a whole or only a region." *Kashani*, 813 F.2d at 847. The fact that Purdue educated students from throughout Indiana, not just from one particular region, suggested to the *Kashani* court that the university was a state agency rather than a local one.

Although NICTD is comprised of only four counties, its purpose is to serve the state as a whole: "The exercise of the powers granted by this [enabling legislation] is in all respects for the benefit of the people of Indiana, for the increase of their commerce and prosperity, and for the improvement of their health and living condition." Ind.Code § 8–5–15–16(a). Residents of the four-county region obviously receive the greatest benefit from the District, but people from anywhere in Indiana can use its services. In fact, the board member selected by the governor is entrusted with "representing the rest of the state." Ind.Code § 8–5–15–3(a)(3). Illinois residents also frequently ride NICTD's trains. Clearly, it serves an area considerably larger than a single county or city.

■ As the above analysis reveals, NICTD has attributes of both a state agency and a political subdivision. Nevertheless, we are persuaded that it is sufficiently dependent on the State of Indiana that it should be viewed as an arm of the state for Eleventh Amendment purposes. Although its board members are not as beholden to the governor as those of many other state agencies (including Purdue), NICTD's mission and powers resemble those of a state body more than those of a city or county, and it is subject to considerable state oversight. Moreover, it serves a far larger area than a city or county

would, and (most importantly) it relies heavily on the state for financial support. Therefore, we follow the two district courts that have addressed this issue and hold that NICTD is an agency of the State of Indiana entitled to Eleventh Amendment immunity from suit by a citizen in federal court. *See Gouge v. Chicago, South Shore and South Bend Railroad,* No. 91 C 1134, 1992 WL 25374, at *5 (N.D.Ill. Jan. 29, 1992); *Phillips v. Northern Indiana Commuter Transportation District,* No. 2:92–CV–286, slip op. at 6 (N.D.Ind. May 11, 1994). Because we hold that this action belongs in state court, not federal court, we need not decide whether to transfer the case to the Northern District of Indiana, and we deny that aspect of NICTD's motion.

## CONCLUSION

NICTD's motion to dismiss on grounds of sovereign immunity is granted. Its motion to transfer is denied.