**IDAHO POTATO COMMISSION,
Plaintiff,**

v.

**M & M PRODUCE FARMS & SALES d/b/a M & M Produce, M & M Packaging, Inc., Matthew Rogowski, Mark Rogowski, John Doe No. 1. Through Doe John No. 100., Defendants.**

**Hapco Farms, Inc., Plaintiff,**

v.

**Idaho Potato Commission, Defendant.**

**Idaho Potato Commission, Plaintiff,**

v.

**Majestic Produce Corp., Majestic Produce Trucking Corp., Christine Richardson, Rita Strumph, Joseph Strumph, George Richardson, John Doe No. 1. Through John Doe No. 100, Defendants.**

**G & T Terminal Packaging Co., Inc., Intervenor,**

v.

**Idaho Potato Commission, Defendant.**

**No. 97 Civ. 8125(CLB).**

United States District Court,
S.D. New York.

Jan. 22, 1999.

David Zaslowsky, Baker & McKenzie, New York City, NY by Howard Adler, Jr., Andrew C. Brassey, Brassey Wetherel, Crawford & McCurdy, Boise, ID, Michael S. Gilmore, Attorney General's Office, Boise, ID, Robert P. Lewis, Baker & McKenzie, New York, NY, for Idaho Potato Com'n.

J. Joseph Bainton, John G. McCarthy, Bainton, McCarthy, & Siegel, New York City, NY, for Hapco Farms, Inc., and Majestic Produce Corp.

Donna E. Frosco, Keane & Beane, White Plains, New York, for M & M Produce Farms & Sales, Mark Rogowski and Matthew Rogowski.

Mark C.H. Mandell, Annadale, NJ, for Majestic Produce Trucking Corp., Christine

Richardson, Rita Strumph, Joseph Strumph, George Richardson.

John G. McCarthy, Hughes, Hubbard & Reed, New York, NY, for Majestic Produce Corp.

### MEMORANDUM & ORDER

BRIEANT, District Judge.

Presently before the Court in these consolidated cases is the motion of the Idaho Potato Commission (the "IPC") (doc. no. 122), brought pursuant to Fed.R.Civ.P. 12(b)(1)(3) and (6), to dismiss the counterclaims of M & M Produce Farms et al., ("M & M") and Majestic Produce Corp. et al., ("Majestic") on grounds of, *inter alia*, Eleventh Amendment Sovereign Immunity. Also before the Court are the motions of the IPC, brought on similar grounds, pursuant to Fed.R.Civ.P. 12(b)(1)(3) and (6), to dismiss the complaint of the intervenor, G & T Terminal Packaging Co., Inc. ("G & T") (doc. no. 124) and the second amended complaint of Hapco Farms, Inc. ("Hapco") (doc. no. 126). These motions were heard and fully submitted on November 20, 1998.

The Court also addresses at this time Hapco's (doc. no. 106) and M & M's (doc. no. 108) motions to reargue this Court's Memorandum and Order dated August, 26, 1998 denying Hapco's, M & M's, and Majestic's (collectively the "Packer Parties" or the "Packers"[1]), motion for partial summary judgment. While some familiarity of the reader with the substantial record in this case must be assumed,[2] facts necessary to place the Court's ruling in its proper context will be provided.

### Background

"We're serious but not solemn about potatoes here. The potato has lots of eyes, but no mouth. That's where I come in."
—E. Thomas Hughes, founder of the Potato Museum, Washington D.C.

As Mr. Hughes has taken steps to immortalize the potato, this Court finds itself in the precarious position of protecting the potato's good name. *Solanum tuberosum*, the potato, is one of the main food crops of the world. The edible part of the plant is a tuber (*i.e.*, the swollen end of an underground stem). The potato, commonly referred to as common potato, white potato or Irish potato, is botanically unrelated to the sweet potato or the yam, with which it is often confused, but is related to the tomato and the tobacco plant, all of which belong to the nightshade family.

The potato's origin can be traced back some 1,800 years to the Peruvian–Bolivian Andes. When the Spanish Conquerors reached South America in the early 1500s, they found the Incas growing potatoes. The Spaniards called them *batata* because they resembled the sweet potatoes grown in the West Indies. The English changed this to "potato." The potato arrived in Europe at the end of the 16th century, aboard Spanish treasure ships. It was grown without fanfare in Spain, and carried by monks to Italy and then across the Alps to Northern Europe. By the end of the 17th century the potato had become a major crop in Ireland.

Antoine–Augustin Parmentier, a French scientist, promoted the potato in 18th century France. As a prisoner of war in Germany he was well fed on potatoes. He recognized their nutritional value and devised schemes to encourage that potatoes be grown and consumed. Parmentier dispelled the superstitious fears of French peasants that potatoes caused leprosy and fevers, and between 1773 and 1789 wrote books and pamphlets urging potato cultivation. As homage, potato soup in France became known as Potage Parmentier.

Once established, the potato became the staple food of the poor of Europe. Vincent Van Gogh's "The Potato Eaters" (1885) depicts a Dutch coal mining family sharing a meal of potatoes and coffee. Van Gogh did several versions of this painting, which remains a famous masterpiece. Van Gogh is not the only artist to incorporate the potato into art. The French artist, Jean Francois Millet's painting "The Angelus" (1859), the original of which is in the Louvre in Paris, shows a farm couple pausing for the evening prayer over their harvest of potatoes.

The potato's story in Ireland is well known. For 200 years the potato, supplemented by small grains and other produce,

---

1. The Court incorporates the intervenor, G & T into the use hereinafter of "Packer Parties" or the "Packers."

2. The procedural history of these consolidated cases was recited by this Court in its oral ruling of July 20, 1998. *See* Transcript 55–63.

fed the healthiest peasants in Europe. Poor tenant farmers, artisans and small holders in Ireland all growing the same variety of potato, and nothing else, in tiny plots allowed them for their families, ate little else. Before the potato, people subsisted on cabbages, turnips, parsnips, beets, peas and beans, together with bread made from wheat and small grains. All of these foods could be dried or otherwise preserved during the winter, but required far more land and labor to generate equivalent subsistence. The coming of the potato deferred the dire future predictions of the Malthusians. The Irish economy became dependent upon the potato. In 1845 and 1846 a disease called late blight, caused by the fungus *Phytophthora infestans*, which rots leaves, stems, and tubers, virtually destroyed the Irish potato crops. When the blight struck, the poor had nothing to eat, resulting in a devastating country-wide famine. At the height of the famine, at least one million people died and many more emigrated to North America and Australia. Over just a few years the population of Ireland dropped from about nine million to little more than four million. The country has never regained its pre–1840 population levels.

As early as 1621, the potato came to Virginia, from England by way of Bermuda. According to the United States Department of Agriculture (USDA), potatoes have now become the most important vegetable crop in the United States, providing 15 percent of vegetable producers annual cash receipts. In the late 19th century, potato production was centered in New York, Pennsylvania and Ohio. As the population moved west, so did potato production. Michigan and Wisconsin became major producers in the early 1900's, but New York remained the leading state until Maine took over in the mid–1920's. Rail transportation and the refrigerated railcar helped Idaho, California, and Colorado compete in eastern U.S. markets during the 1930's and 1940's. However, Maine remained the leading producer until the late 1950's when the rising popularity of processed (especially frozen) potatoes placed the state of Idaho in the lead with its Russet Burbank variety.

The Russet Burbank was originated in 1914 by Lou Sweet, a potato grower in the western slope area of Colorado who later became the President of the Potato Association of America in 1920. Mr. Sweet selected a mutation of the Burbank potato named after Luther Burbank, a pioneer in selective improvement of seeds and plants. According to the Potato Association of America, the Russet Burbank variety is the standard for excellent baking and processing quality. Additionally, the variety gained value based on its somewhat better resistance to a number of potato tuber diseases. As a result, the Russet Burbank is now the leading variety of the more than 500 different potatoes grown in the United States.

With the average American consuming 137.9 pounds of potatoes a year as recently as 1995, potatoes rank second (behind wheat) in importance to U.S. growers among crops grown primarily for food use (as opposed to livestock feed or for vegetable oil production). According to the USDA, Idaho, Washington, and Oregon currently produce over half of the U.S. crop, with much of this crop processed (mostly into frozen french fries). The USDA lists potatoes as the leading vegetable crop with a farm value of between $2 and $3 billion dollars and reports that the state of Idaho remains at the top of this significant industry.

These consolidated cases represent a legal challenge to the power of the Idaho Potato Commission and the entire Idaho potato industry; the outcome and effect of which is clearly no small potatoes.

*The Idaho Potato Commission*

The IPC is an agency created by the Idaho Legislature and charged with promoting the sale of Idaho potatoes, resisting the unlawful misbranding of other potatoes as Idaho potatoes, and protecting the quality of Idaho potatoes.[3] In an effort to maintain and pro-

---

3. As used herein "Idaho Potatoes" refers to russet potatoes grown in Idaho. We do not reach or consider whatever issues may arise when pota- toes of identical genetic content are grown under substantially identical soil and climate conditions in one of the states which border Idaho.

tect the identity and integrity of Idaho potatoes, pursuant to Idaho Code §§ 22–1207(9), the IPC is required to "devise and require the application of either a seal, label, brand, package, or any other suitable device that will protect the identity of the original Idaho pack of potatoes as near to the final consumer as possible." Consistent with that statutory requirement, the IPC or the State of Idaho duly registered in the principal register of the United States Patent and Trademark Office (the "PTO") the following five "certification marks" (collectively the "Idaho Marks"):

(1) Registration number 631,499 (the '499), first registered on July 24, 1956, applies to the following stylized certification mark when used in connection with potatoes:

The '499 certifies the "regional origin" of goods that are so marked.

(2) Registration number 802,418 (the '418), first registered on January 11, 1966, applies to the following certification mark when used in connection with potatoes:

**IDAHO**

The '418 certifies that "goods so marked are grown in the State of Idaho."

(3) Registration number 943,815 (the '815), first registered on September 26, 1972, applies to the following stylized certification mark when used in connection with potatoes:

The '815 certifies "that goods so marked are grown in the state of Idaho."

(4) Registration number 1,223,007 (the '007), first registered on January 4, 1983, applies to the following stylized certification mark when used in connection with potatoes:

The '007 certifies "that goods so marked were grown in the State of Idaho."

(5) Registration number 1,735,559 (the '559), first registered on November 24, 1992, applies to the use of the following stylized certification:

The '559 certifies that goods so marked are "grown in Idaho."

The IPC has also registered the trademark "IDAHO" with the Idaho Department of State, registration number 6101, which "mark certifies that goods so marked are grown in the State of Idaho." The IPC also claims common law trademark rights in the words "IDAHO" and "GROWN IN IDAHO" when used in conjunction with the word "potato."

As recently as 1998, the Idaho Legislature has confirmed the powers of the IPC and explicitly directed the IPC to "require all those using any of the Idaho trade or certification marks, or handling or packing potatoes grown in Idaho, to execute an agreement in the form prescribed by the commission . . ." Idaho Legislature, S. Bill No. 1399.

Shippers who purchase and resell Idaho potatoes in 5- and 10-pound consumer bags do not need an IPC license. The IPC does require, however, that all shippers who buy Idaho potatoes in bulk and then repackage them in consumer bags must obtain a license and agree to submit to IPC's audit and inspection process. The IPC charges a nominal sum for an annual license fee of $100 for shippers located in Idaho, or $300 for shippers located outside the state. The IPC licensing agreements contain clauses that acknowledge that certain of the Idaho Marks "are valid, registered marks," and that the parties to the licensing agreement "will not during the term of the agreement, or at any time thereafter, attack the title or any rights" of the IPC in and to the relevant Idaho Marks.

*M & M Produce Farms & Sales*

In 1990, defendant M & M, a repacker of produce, entered into a licensing agreement with the IPC to use Idaho marks. In February 1995, the IPC terminated M & M's license as a result of M & M's failure to comply with the provisions of the agreement. Thereafter, M & M was prohibited from using Idaho marks. In October 1997, during a compliance audit that the IPC's auditors were conducting of the operations of G & T Terminal Packaging Company, one of its licensees, located in the Hunts Point Terminal Market in New York City, the IPC learned that M & M was repacking potatoes for G & T in G & T bags bearing marks that were identical or substantially indistinguishable from IPC's marks '007 and '418. The license agreement between the IPC and G & T prohibits assignment or sublicenses of the licensee's right to the IPC's marks. The IPC also claims that M & M was repacking non-Idaho potatoes and potatoes failing to meet quality requirements in G & T bags bearing marks that were identical or substantially indistinguishable from IPC's marks '007 and '418.

As a result of these actions, the IPC brought suit against M & M (97 Civ. 8125) alleging, *inter alia*, that M & M diluted and counterfeited the Idaho Marks in violation of the Lanham Act, 15 U.S.C. § 1501 *et seq.*, and New York and Idaho statutory and common law.

M & M alleges the following counterclaims against the IPC: cancellation of the IPC marks under federal law (First, Second and Third Counterclaims); cancellation of the IPC marks under state and common law (Fourth Counterclaim); restraint of trade in violation of the Donnelly Act, New York General Business Law § 340 (Fifth Counterclaim); interference with contractual relations (Sixth Counterclaim); interference with prospective contract (Seventh Counterclaim); federal antitrust violations under the Sherman Act and Clayton Act (Eighth and Ninth Counterclaims); and prima facie tort (Tenth Counterclaim).

*Majestic Produce Corp.*

Majestic, also a repacker of produce, applied for a license from the IPC in the fall of 1996. After the IPC questioned Majestic' general manager, Joe Strumph's, role in a company that had previously been caught mislabeling, Majestic withdrew its application. In 1997, the IPC learned that without ever receiving a license from the IPC, Majestic was selling potatoes in bags with the IPC's marks. The IPC filed suit against Majestic (98 Civ. 2934) alleging the same claims that it did against M & M. Majestic counterclaims against the IPC on the following grounds: cancellation of the IPC marks under federal law (First, Second and Third Counterclaims); cancellation of the IPC marks under state and common law (Fourth Counterclaim); and federal antitrust violations under Sections 1 and 2 of the Sherman Act (Fifth and Sixth Counterclaims).

*Hapco Farms, Inc.*

Although the facts alleged in Hapco's second amended complaint must be accepted as true for the purposes of IPC's motion to dismiss, to place this Court's decision in context, the Court takes notice of the prior history of relationships between Hapco and the IPC. In 1983, Hapco, one of the largest produce sellers and repackers in the United States, entered into a license agreement with the IPC for the use of the Idaho marks. Hapco renewed this license annually through August 31, 1996. In February 1996, the IPC was notified of possible misbranding by Hapco—*i.e.* packaging non-Idaho potatoes in containers with the Idaho marks. The IPC conducted a formal administrative hearing that culminated in the signing of a consent order which included: a $200,000.00 civil penalty against Hapco; the surrender of Hapco's license; and an acknowledgment from Hapco that the Idaho marks covered in the licensing agreement were valid and subsisting and entitled to protection under the Lanham Act and related state and common law, and that the IPC was their sole owner. *See* Kole Decl. at Exh. 4., hereinafter the *Consent Order.*

By way of its second amended complaint, Hapco now challenges the ability of the IPC to maintain the Idaho marks. Hapco has no present interest in reobtaining a license from the IPC, but rather is seeking declaratory and injunctive relief by the Court canceling each of the Idaho marks under federal and state law (First and Second Claims). Specifically, Hapco alleges that it wishes "to purchase russet potatoes grown in Idaho from non-Idaho brokers; ship them to various Hapco facilities located in states other than Idaho; repack them in consumer sized bags (mostly 5 and 10 pound bags); and then sell the repacked potatoes to customers, consisting primarily of grocery stores." Hapco Second Amended Complaint ¶ 30. Hapco alleges that the "repacked bags would bear in substance the following lettering:

[NAME OF HAPCO GROCERY STORE CUSTOMER] .IDAHO RUSSET POTATOES

or

[NAME OF HAPCO GROCERY STORE CUSTOMER] RUSSET POTATOES GROWN IN IDAHO."

*Id.*

Hapco also seeks compensatory damages of not less than $15 million, and treble damages on three claims of antitrust violations. Hapco's Third Claim alleges that the IPC has violated Section 1 of the Sherman Act by anti-competitive and unjustified acts. Specifically, Hapco alleges that the IPC dominates and otherwise controls the Idaho potato industry, which enables the IPC to affect competition significantly in the market for shipping, packing and distributing Idaho potatoes. Hapco further alleges that the IPC uses its control to restrain trade of bulk sales of potatoes grown in Idaho. Hapco's Fourth Claim alleges that the IPC maintains a monopoly over, and otherwise controls and dominates, the Idaho potato industry in violation of section 2 of the Sherman Act. Hapco's Fifth Claim realleges these arguments as a violation of the New York State Donnelly Act.

*G & T Terminal Packaging Co., Inc.*

G & T, a packer and repacker of potatoes, also seeks to purchase and repack Russet

and other potatoes grown in Idaho in the manner proposed by Hapco. G & T brings this lawsuit despite having entered into a licensing agreement with the IPC, similar in nature to those entered into by M & M and Hapco. G & T's claims are nearly identical to the other Packer Parties' claims in that it seeks a declaratory judgment canceling the Idaho marks under federal and state law (First, Second, Third, and Fourth Claims); injunctive relief and compensatory and treble damages for federal and state antitrust violations (Fifth, Sixth, and Seventh Claims); and compensatory damages for prima facie tort (Eighth Claim).

## Discussion

## THE IPC'S MOTIONS TO DISMISS

### Eleventh Amendment Immunity

█ The IPC argues that as an agency of the state it is immune from suit by Hapco and G & T under the Eleventh Amendment. The IPC also seeks sovereign immunity from M & M's and Majestic's counterclaims, except for compulsory counterclaims to the extent they seek set off or recoupment reducing any affirmative recovery by the IPC. The Packers claim that the IPC is not a state agency entitled to Eleventh Amendment immunity, and that assuming, *arguendo*, it is, any immunity from Hapco's and G & T's claims for cancellation of the IPC's marks has been abrogated by the Lanham Act, as amended by the Trademark Remedy Clarification Act of 1992, 15 U.S.C. § 1122.

The Eleventh Amendment provides as follows:

> The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. CONST. amend. XI. The Supreme Court has interpreted the Eleventh Amendment to include actions brought by any citizen against a state in federal court. *See Mancuso v. New York State Thruway Authority*, 86 F.3d 289, 292 (2d Cir.1996) *cert. denied*. 519 U.S. 992, 117 S.Ct. 481, 136 L.Ed.2d 375 (1996); *Hans v. Louisiana*, 134 U.S. 1, 10–11, 10 S.Ct. 504, 33 L.Ed. 842 (1890). Any entity may enjoy Eleventh Amendment immunity if it can demonstrate that it is "more like 'an arm of the state,' such as an agency, than like 'a municipal corporation or other political subdivision.'" *Mancuso*, 86 F.3d at 292 (quoting *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

Initially, the Court rejects reliance by the Packers on *Idaho Potato Commission v. Washington Potato Commission*, 410 F.Supp. 171 (D.Idaho 1975). At most, that case, which has no precedential value, represents a finding that the *Washington* Potato Commission is not entitled to Eleventh Amendment immunity. The Packer's, however, argue from that case that "the United States District Court for the District of Idaho has already determined [in that case] that [the IPC] is not a state agency." Packers' Brief at p. 2. (emphasis in original). In *Idaho Potato Commission*, the IPC's status as a state agency was analyzed only in terms of who was the real party in interest for the purposes of determining diversity jurisdiction. *Cf. Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 430 n. 6, 117 S.Ct. 900, 137 L.Ed.2d 55 (1997). The *Idaho Potato Commission* court never held, explicitly or otherwise, that the IPC was not a state agency. Accordingly, this Court rejects the Packers' arguments for collateral estoppel and a binding adoptive admission arising out of that case. Our decision is informed only by *Mancuso* analysis.

### Mancuso Analysis

In deciding whether an entity is immune from suit in a federal court under the Eleventh Amendment, our Court of Appeals has held that this Court must consider the following six factors: "(1) how the entity is referred to in the documents that created it; (2) how the governing members of the entity are appointed; (3) how the entity is funded; (4) whether the entity's function is traditionally one of local or state government; (5) whether the state has a veto power over the entity's actions; and (6) whether the entity's obligations are binding upon the state." *Mancuso*, 86 F.3d at 293.

Should the Court find that the above stated factors point in different directions, or are evenly balanced, then the Court must consider whether allowing the entity to be sued in federal court would put the state treasury at risk and/or whether it would threaten the integrity of the state. *Id.* As a last resort, our Court of Appeals has told us to "remain mindful of the Supreme Court's emphasis that 'the vulnerability of the State's purse [is] the most salient factor.' " *Mancuso*, 86 F.3d at 293. (quoting *Hess v. Port Authority Trans–Hudson Corporation*, 513 U.S. 30, 48, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994)); *See Regents*, 519 U.S. at 429–30, 117 S.Ct. 900 (considering the nature of the entity created by state law and whether a money judgment against the entity would be enforceable against the state treasury).

The first *Mancuso* factor, how the entity is referred to in the documents that created it, favors a finding of immunity. The Idaho Code § 22–1202 clearly created and established the IPC as part of the state's department of self-governing agencies. *See* Idaho Code § 67–2601 ("the department of self-governing agencies ... shall, for the purposes of section 20, article IV of the constitution of the state of Idaho, be an executive department of the state government."). Such language is conclusive that the State of Idaho intended the IPC to be a department of the state. The *Mancuso* court also looked at the state's decisional law to help determine the formal status of the entity. The IPC cites to an Idaho trial court decision, *Randolph v. Idaho Potato Commission*, Case No. 95420, page 1 (Idaho Fourth Jud.Dist. 1993) ("the Commission is a state agency") as proof of conclusive evidence of the IPC's status as state agency. The *Randolph* court's analysis of the IPC's creating documents confirms further that the IPC is a state agency. Thus, this factor points toward immunity.

The second *Mancuso* factor requires the Court to consider who appoints the IPC members. This factor also favors a finding of immunity. The IPC consists of nine members: five growers, who are geographically represented; two shippers; and two processors, all of whom are appointed by the Governor. Idaho Code § 22–1202; Gilmore Decl. ¶ 6.

The third *Mancuso* factor, how the IPC is funded, weighs heavily against immunity. The IPC is clearly self-funded by a "tax" that it levies on potatoes. Idaho Code § 22–1211. This "tax" is assessed, by the IPC, "for the sole purpose of financing, on behalf of the potato industry in Idaho, the commission's activities." Idaho Code § 22–1204(13). The IPC also funds itself through licensing agreements, Idaho Code § 22–1207(12), and civil penalties it imposes on transgressors. Idaho Code § 22–1213. Although all funds received by the IPC are deposited in state depositories, they are deposited in one or more separate accounts in the name of the IPC, and may only be "appropriated for" use by the IPC. Idaho Code § 22–1209.

The fourth *Mancuso* factor, whether the entity's function is traditionally one of state or local government, is inconclusive. The IPC's articulated function is to "expand the markets and increase consumption of potatoes produced in [Idaho], thereby promoting the general welfare of [the citizens of Idaho]." Idaho Code § 22–1201. The power to tax and regulate an industry, Idaho Code §§ 22–1205, 22–1207, are clearly traditional government functions. However, the IPC has also been empowered to "plan and conduct a campaign for commodity advertising, publicity and sales promotion to increase the consumption of potatoes." Idaho Code § 22–1208. It is equally clear that advertising and marketing of produce are not traditional government functions.

The fifth *Mancuso* factor, whether the State of Idaho has a veto power over the IPC, points against immunity. No provision of the Idaho state code provides the state with an express veto power over the IPC. The IPC argues that the state asserts control over the IPC by subjecting the IPC to audits and mandating that the IPC follow "GAAP government standards" in the preparation and submission of its financial statements. These arguments are unpersuasive as our Court of Appeals has held that state control is not evidenced by the state's attempt to ensure fiscal responsibility. *Mancuso*, 86 F.3d at 296. Equally unpersuasive is the

IPC's argument that the Idaho Legislature maintains an "effective veto" through its ability to amend, modify or reject an administrative rule by *any* of the Idaho state agencies, or that the Idaho judicial branch maintains a veto power because of its ability to review and set aside the IPC's enforcement actions upon the petition of an aggrieved person with standing. There is no contention made that the Idaho Court may intrude in the conduct of the IPC simply as part of some generalized visitorial power, or at the behest of some citizen motivated only by a desire for good government.

The sixth, and last, *Mancuso* factor, whether a judgment against the IPC will place the state treasury at risk, also weighs against finding immunity. Idaho law expressly provides that "[a]ll expenses incurred by the [IPC] in performing its duties and exercising its powers shall be without liability on the part of the state." Idaho Code § 22–1210. The relevant statutory provision in *Mancuso* was almost identical. *Mancuso*, 86 F.3d at 296. The IPC argues, however, that pursuant to the Idaho Tort Claims Act, Idaho Code §§ 6–109 *et seq.*, which must be read together with the IPC's organic statute, the state is responsible for non-contractual claims against the IPC. The IPC argues that tort damages recovered against all state agencies are in effect paid out of the state treasury because the funds used to pay unsatisfied judgment are obtained from a "retained risk account," established pursuant to Idaho Code § 67–5776 and administered by the Idaho Department of Administration, Division of Insurance Management, Bureau of Risk Management. *See* Ness. Decl. ¶ 3, 4. The Court is unpersuaded by this argument. The IPC is obligated to fund its proportionate share of contributions for building up and maintaining the "retained risk account," Idaho Code § 6–921, and however much the amount of the judgment, the maximum amount that Idaho law allows for payments from the "retained risk account" for any one claim is $500,000.00. *See* Ness. Decl. ¶ 6. Most important, however, is that the IPC, through its counsel, a Deputy Attorney General of the State of Idaho, has conceded that

the only way that the state treasury itself would be liable is if the "retained risk account" were depleted and the Idaho Legislature *voluntarily* passed an act "to create additional funding sources." *See Transcript* p. 10. Thus, not only is the "retained risk account" essentially funds of the IPC, and similar sister agencies, in the absence of a voluntary legislative act, no provision of Idaho law commits the Idaho state treasury to satisfy a judgment against the IPC.

With the six factors in a near state of equipoise, as they were in *Mancuso*, the Court turns "to the two purposes underlying the Eleventh Amendment—protection against state liability and respect for state sovereignty," *Mancuso*, 86 F.3d at 296,— "remain[ing] mindful of the Supreme Court's emphasis that 'the vulnerability of the State's purse [is] the most salient factor.'" *Mancuso*, 86 F.3d at 293 (quoting *Hess*, 513 U.S. at 48, 115 S.Ct. 394). As discussed as part of the sixth factor, the state treasury comes into risk only in the event of a voluntary act of the Idaho Legislature. Our Court of Appeals has already determined that the ability and likelihood that the state will pay voluntarily the judgment debts of an entity does not legally obligate the state treasury. *See Feeney v. Port Authority Trans–Hudson Corporation*, 873 F.2d 628, 631–32 (2d Cir. 1989), *aff'd on other grounds*, 495 U.S. 299, 110 S.Ct. 1868, 109 L.Ed.2d 264 (1990).[4]

As the Idaho state treasury is not legally or practically at risk, the sole remaining question is whether suit in federal court would be an affront to the dignity of the State of Idaho. Knowing, as it does, that the IPC has entered this forum voluntarily as a plaintiff to adjudicate its trademark rights against M & M and Majestic, the Court considers it unlikely that it would be an affront to the IPC or its parent to require it to defend in this forum related claims by the Packer Parties attacking, *inter alia*, the validity of those same trademarks as to which the IPC is plaintiff. Thus, the Court concludes that the Idaho Potato Commission is

---

**4.** This view has been adopted in the Ninth Circuit, Idaho's circuit, as well. *See Durning v.* *Citibank, N.A.*, 950 F.2d 1419, 1425 n. 3 (9th Cir.1991).

not entitled to Eleventh Amendment immunity.

**Antitrust Violations**

Before attacking both the federal and state antitrust violations on the merits, the IPC seeks to dismiss the Packer Parties antitrust claims based upon the "state action" doctrine derived from the landmark case of *Parker v. Brown*, 317 U.S. 341, 63 S.Ct. 307, 87 L.Ed. 315 (1943), and its progeny. Our Court of Appeals has recognized two types of state action antitrust immunity. The first type is "when a state acts in its sovereign capacity, its actions are immune from federal antitrust scrutiny." *Cine 42nd Street Theater Corp. v. Nederlander Org.*, 790 F.2d 1032, 1042 (2d Cir.1986). Thus, this type of state action antitrust immunity requires a finding that the IPC is the state. *Id.* at 1044. The second type provides immunity when the party seeking immunity is not the "the State itself." *See Automated Salvage Transport, Inc. v. Wheelabrator Environmental Systems, Inc.*, 155 F.3d 59, 70 (2d Cir.1998). Before a state action defense will be available under those circumstances, the party must first identify a clearly expressed state policy that authorizes its actions, and then prove that its resulting anticompetitive conduct was a foreseeable consequence of the state delegation. *Cine 42nd Theater*, 790 F.2d at 1042–44.

There is insufficient evidence available at this stage of the litigation to permit resolution of this fact intensive issue, even assuming that our *Mancuso* analysis of the status of IPC as an alter ego of the state is correct. The motion is denied with leave to renew after pretrial discovery is complete.

**Contract Estoppel against G & T's and Hapco's Trademark claims**

■ The IPC argues that as recently as August 31, 1998, IPC and G & T were parties to a licensing agreement in which G & T acknowledged that the Idaho marks "are valid, registered" marks, and agreed that it "will not during the term of the agreement, or any time thereafter, attack the title or any rights" of the IPC "in and to the relevant Idaho Marks." *See* Kole Decl. at Exh. 1., hereinafter the *G & T Licensing Agreement.* By Memorandum & Order dated August 26, 1998, this Court held that M & M and Hapco were estopped from challenging the validity of the Idaho marks covered by similar language in the M & M and Hapco Licensing Agreements. The *G & T Licensing Agreement* covers all the Idaho marks, except the IPC's state registered trademark/service mark "IDAHO." [5] Thus, this Court dismisses G & T's claims for declaratory judgment on the federal certification marks (First, second and Third Claims) as G & T is estopped from challenging the validity of the federal marks in dispute. However, G & T is not estopped from challenging the state trademark under its Fourth Claim. Consistent with the Court's prior ruling, Hapco's claims seeking cancellation of the federal Idaho marks (First Claim) are barred.

**Collateral Estoppel and Res Judicata Effect of the *IPC—Hapco Consent Order***

■ The IPC seeks to assert collateral estoppel and res judicata against Hapco based on the consent order entered into between the parties. The consent order covers only the Idaho marks covered by the Hapco licensing agreement, which the Court has already ruled that Hapco is barred from challenging. Thus, the Court need not address the collateral estoppel effect of the consent order because such an argument is moot. Likewise, the Court does not have to address whether res judicata would operate based on a consent order entered into before the quasi-administrative IPC,[6] because the only remaining claims of Hapco, cancellation of the state and common law marks and federal and state antitrust violations, were not the same causes of action raised in the

---

5. This mark is registered under No. 6101.

6. *See Amalgamated Sugar Co. v. NL Industries, Inc.*, 825 F.2d 634, 639 (2d Cir.1987) (the general rule is that a final consent decree is entitled to *res judicata* effect because the entry of a consent judgment is an exercise of judicial power), *cert.* denied, 484 U.S. 992, 108 S.Ct. 511, 98 L.Ed.2d 511 (1987); *See also Greenberg v. Board of Governors of the Federal Reserve System*, 968 F.2d 164, 168 (2d Cir.1992) ("res judicata applies to judgments by courts and by administrative agencies acting in an adjudicative capacity").

litigation that culminated in the consent order. *See In re Teltronics Services, Inc.,* 762 F.2d 185, 190 (2d Cir.1985) (the doctrine of res judicata "applies to preclude later litigation if the earlier decision was (1) a final judgment on the merits, (2) by a court of competent jurisdiction, (3) in a case involving the same parties or their privies, and (4) *involving the same cause of action.*") (emphasis added). Additionally, the IPC has failed to demonstrate that Hapco could have raised its antitrust claims in the prior proceeding. *See DeSario v. Thomas,* 139 F.3d 80, 87 (2d Cir.1998) ("[F]or any claim to be barred by res judicata, the [party] must have had the opportunity to raise the claim in the first proceeding.") *judgment vacated on other grounds by Slekis v. Thomas,* —— U.S. ——, 119 S.Ct. 864, 142 L.Ed.2d 767 (1999).

The Court is unpersuaded by the IPC's reliance on *Wallace Clark & Co. v. Acheson Industries, Inc.,* 532 F.2d 846, 849 (2d Cir.) *cert. denied,* 425 U.S. 976, 96 S.Ct. 2177, 48 L.Ed.2d 800 (1976). In *Wallace,* our Court of Appeals held that a consent decree adjudicating a patent's infringement as well as its validity bars a party to the decree from subsequently challenging the validity of that same patent. That analysis is inapposite to Hapco's remaining claims which address cancellation of trademarks not adjudicated under the consent decree or antitrust claims which do not directly challenge the Idaho marks that were adjudicated under the consent decree.

Lastly, the Court finds that the IPC and Hapco did not intend to use the consent decree as a general release for all future claims. The consent order reads, in pertinent part, as follows: "This consent order resolves all matters known and unknown, regardless of location, between IPC and Hapco *to May 1996." Consent Order* ¶ 4. Thus, to the extent that Hapco's state and common law trademark claims and antitrust claims involve any matters predicated on facts arising after May 1996, they are not barred.

**M & M's Counterclaim for Prima Facie Tort**

■ Under New York law, the elements for a cause of action for prima facie tort are: (1) intentional infliction of harm, (2) causing special damages, (3) without excuse or justification, and (4) by an act or series of acts that would otherwise be lawful. *Burns Jackson Miller Summit & Spitzer v. Lindner,* 59 N.Y.2d 314, 332–33, 464 N.Y.S.2d 712, 721, 451 N.E.2d 459 (1983) Additionally, the plaintiff must allege "that defendants' sole motivation was 'disinterested malevolence.'" *Id.* (quotations in original). "In other words, the sole motivation for the damaging acts must have been a malicious intention to injure the plaintiff." *Marcella v. ARP Films, Inc.,* 778 F.2d 112, 119 (2d Cir.1985). Our Court of Appeals has held that "[w]hen there are other motives, such as profit, self interest, or business advantage, there is not recovery under the doctrine of prima facie tort." *Id.*

Not only does M & M's Tenth Counterclaim fail to specifically allege that the IPC's actions were solely motivated by "disinterested malevolence," but by repeating and realleging the first 220 paragraphs of its first nine counterclaims into the Tenth Counterclaim, M & M has in effect plead "other motives" for the IPC's actions. M & M's has, therefore, failed to plead an alternative cause of action of prima facie tort. *Compare Burns Jackson Miller Summit & Spitzer v. Lindner,* 59 N.Y.2d at 333, 464 N.Y.S.2d 712, 451 N.E.2d 459. Thus, the IPC's motion to dismiss M & M's Tenth Counterclaim is granted. For these same reasons, the Court, *sua sponte,* dismisses G & T's claim for prima facie tort (Eighth Claim).

**Venue**

■ Pursuant to Fed.R.Civ.P. 12(b)(3), the IPC seeks to dismiss the complaints of both G & T and Hapco on grounds of improper venue. Because G & T and Hapco both allege claims under both New York state and federal law, jurisdiction rests on both the diversity of the parties, *see* 28 U.S.C. § 1331, and the presence of a federal question, *see* 28 U.S.C. § 1332. The appropriate venue provision is thus 28 U.S.C. § 1391(b), which applies in civil actions where "jurisdiction is not founded solely on diversity of citizenship." 28 U.S.C. § 1391(b) provides, in relevant part, that such actions may be brought only in: (1) a judicial district where all defendants

reside, (2) a judicial district in which "a substantial part of the events or omissions giving rise to the claim occurred," or (3) a judicial district in which any defendant may be found, if the action cannot be brought in any other district.

Taking in account that (1) the alleged antitrust violations are based on anti-competitive and monopolistic conduct which, if proven, have a detrimental effect on commerce within this district; (2) G & T and Hapco are seeking declaratory relief canceling the trademarks so that they may continue to engage in repacking of potatoes within the district; (3) the IPC has brought suit against M & M and Majestic within this district challenging the same activity which comprise the basis of G & T's and Hapco's complaints; and (4) our Court of Appeals has directed that the District Courts need not determine the best venue, only that venue is proper, *see Bates v. C & S Adjusters, Inc.*, 980 F.2d 865, 867 (2d Cir.1992), the Court holds that a substantial part of the events or omissions giving rise to the G & T's and Hapco's claims occurred within the district. Thus, venue is proper.

## HAPCO'S AND M & M'S MOTION FOR RECONSIDERATION

Hapco and M & M both seek reconsideration of issues that the Court has already decided. First, Hapco reargues that it should not be estopped from challenging the Idaho marks of which it acknowledged the validity as part of its licensing agreement with the IPC. Hapco supports this contention by attempting to analogize its position to a "Catch 22." Hapco argues that the only way it could certify its goods is to enter into a licensing agreement with the IPC which in turn requires an agreement to never challenge the Idaho marks. Hapco then claims that the IPC has created a situation, against public policy, where no one will be able to challenge the validity of the Idaho marks. The Court chooses not to travel down that slippery slope with Hapco, as the Court and Hapco need only look to the Court's ruling allowing Majestic to challenge the Idaho marks, to undermine Hapco's argument. The Court held that although it did not enter into a licensing agreement with IPC, Majes-

tic still has standing to challenge the Idaho marks.

Hapco's second issue for reargument is also denied for want of merit. Once again without citing any law or referencing any evidence, Hapco asks this Court to reconsider its ruling denying partial summary judgment on the basis of cancellation of the Idaho marks pursuant to 15 U.S.C. § 1064(5)(D), which prohibits a certifier from "discriminately refus[ing] to certify or to continue to certify goods or services of any person who maintains the standards or conditions which such mark certifies." The Court has already ruled that § 1064(5)(D) calls for a fact-intensive inquiry, which does not lend itself readily to resolution by summary judgment. Hapco's motion to reconsider is denied on both grounds.

M & M's motion for reconsideration also fails for want of merit. M & M seeks to reargue cancellation of the Idaho marks based on the argument that the IPC commissioners are personally "engage[d] in the production or marketing of any goods or services to which the certification mark is applied." 15 U.S.C. § 1064(5)(B). The Court has already rejected this argument on two separate grounds: first, that the IPC is the registered owner of the Idaho marks and therefore the activities of its individual commissioners are not implicated; and second, that as a matter of law the IPC has not produced or marketed potatoes because the Packers never contended that the IPC sold potatoes bearing any of the Idaho marks.

### Conclusion

For the reasons set forth above, IPC's motions to dismiss (doc. nos. 122, 124, and 126) are granted in part and denied in part. Hapco's (doc. no. 106) and M & M's (doc. no. 108) motions for reconsideration are both denied.

The Court hereby stays all proceedings in these consolidated actions for a period of thirty (30) days within which the IPC if so advised may seek appellate review of this interlocutory order to the extent it denies Eleventh Amendment immunity, and if such an appeal is taken the stay shall continue thereafter until the receipt of this Court of the mandate of the Court of Appeals resolv-

ing such appeal. *See generally Mancuso*, 86 F.3d at 291; *Puerto Rico Aqueduct & Sewer Authority v. Metcalf & Eddy, Inc.*, 506 U.S. 139, 144, 113 S.Ct. 684, 121 L.Ed.2d 605 (1993).

With respect to all other matters adjudicated in this Memorandum & Order, the Court declines to make the finding contemplated by Fed.R.Civ.P. 54(b).

SO ORDERED.