Kevin AGUILAR et al., Plaintiffs,

v.

THE NEW YORK CONVENTION CEN-
TER OPERATING CORPORATION,
Gerald T. McQueen, and Richard
Powers, Defendants.

No. 00 CIV 4637 CBM.

United States District Court,
S.D. New York.

Nov. 5, 2001.

Barry A. Weprin, Milberg, Weiss, Bershad, Hynes & Lerach, LLP, New York City, Rick Ostrove, Leeds, Morelli & Brown, P.C., for plaintiffs.

Richard A. Levin, and Amy B. Regan, Proskauer Rose, LLP, New York City, for defendant New York Convention Center Operating Corporation.

Frederic L. Lieberman, Assistant Attorney General of the State of New York, New York City, for defendants McQueen and Powers.

## OPINION

MOTLEY, District Judge.

The fifty individual plaintiffs in this matter, each of whom is either female or a member of a racial or ethnic minority, are carpenters and freight handlers currently or formerly employed by the Jacob K. Javits Convention Center ("Javits Center") in Manhattan. Plaintiffs allege that the Javits Center is managed by a group of "white Irish males" who have engaged in widespread race and gender discrimination. In addition to giving white male employees preferences with respect to the type and amount of work that is assigned, plaintiffs claim that the Javits Center's management has created and condones a hostile work environment rife with racist and misogynist epithets. Plaintiffs also allege that they have been denied various privileges of employment and singled out for reprimand because of their race and/or gender, and that they have been retaliated against for complaining to management.

Plaintiffs sued the New York Convention Center Operating Corporation ("NYC-

COC") – the entity that operates the Javits Center – as well as its President and CEO, Gerald McQueen, and its dockmaster, Richard Powers. Plaintiffs assert causes of action under 42 U.S.C. § 1981; 42 U.S.C. § 1983; the Equal Pay Act, 29 U.S.C. § 206(d); the New York State Human Rights Law, N.Y. Exec. Law § 296 ("NYSHRL"); and the New York City Civil Rights Law, N.Y.C. Admin. Code § 8–102 ("NYCCRL"). Defendants moved to dismiss the complaint on a variety of grounds. For the reasons set forth below, defendants' motion is GRANTED in part and DENIED in part.

## A. Eleventh Amendment Immunity

Defendants first argue that the Eleventh Amendment affords them immunity from this suit. It is well settled that the Eleventh Amendment bars suits against a state in federal court unless Congress has abrogated or the state has waived its sovereign immunity. *See, e.g., Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 99, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984).[1] Here, however, plaintiffs have not sued the state of New York itself but rather the NYCCOC, an entity created by the state for the purpose of constructing and operating the Javits Center. The question therefore is whether the NYCCOC is more like an "arm of the state," in which case the Eleventh Amendment applies, or more like "a municipal corporation or other political subdivision," in which case the Eleventh Amendment does not apply. *See Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 280, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977).

In *Mancuso v. New York State Thruway Authority,* 86 F.3d 289 (2d Cir. 1996), the Second Circuit reaffirmed its six-factor inquiry for determining whether a state-created entity enjoys Eleventh Amendment immunity under the "arm of the state" doctrine: (1) how the entity is referred to in the documents that created it; (2) how its governing members are appointed; (3) how it is funded; (4) whether its function is traditionally one of local or state government; (5) whether the state has veto power over its actions; and (6) whether the entity's financial obligations are binding upon the state. *See id.* at 293 (citing *Feeney v. Port Auth. Trans–Hudson Corp.,* 873 F.2d 628, 630–31 (2d Cir. 1989)). If these six factors point in different directions, the tension must be resolved mindful of the Eleventh Amendment's twin rationales – protecting states' treasuries and protecting their dignity. *See id.* (citing *Hess v. Port Auth. Trans–Hudson Corp.,* 513 U.S. 30, 115 S.Ct. 394, 130 L.Ed.2d 245 (1994)). "[T]he vulnerability of the State's purse [is] the most salient factor." *Id.* (quoting *Hess,* 513 U.S. at 48, 115 S.Ct. 394). Applying these factors, the Court concludes that the NYCCOC is not an "arm of the state" for Eleventh Amendment purposes.

The first factor – how the entity is referred to in the documents that created it – weighs neither for nor against a finding of immunity. The New York State Legislature created the NYCCOC as a "body corporate and politic" constituting a "public benefit corporation." N.Y. Pub. Auth. Law § 2562(1). With respect to the former term, *Mancuso* instructs that the designation "body corporate and politic" does "little to advance [the] inquiry," for it has been used by the legislature "to refer to a wide variety of entities, some of which

---

1. Although the text of the Eleventh Amendment speaks only to suits against a state by persons who are not citizens of that state, the Supreme Court has interpreted it to extend to suits by any person against a state in federal court. *See Hans v. Louisiana,* 134 U.S. 1, 10–11, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

[certainly] would not be found to be arms of the state," and some of "whose status under the Eleventh Amendment is far less certain." *Mancuso*, 86 F.3d at 294. With respect to the latter term, the legislature has defined "public benefit corporation" to mean "a corporation organized to construct or operate a public improvement wholly or partly within the state, the profits of which inure to the benefit of this or other states, or to the people thereof." N.Y. Gen. Constr. Law § 66(4). This generic definition is equally unhelpful to the task at hand, especially given that the parties have not pointed the Court to any New York authority further elucidating the nature of a public benefit corporation.

Nor does any other language in the statute creating the NYCCOC weigh decidedly toward or against a finding of immunity. On one hand, the legislature characterized the NYCCOC's mission as an "essential government function." N.Y. Pub. Auth. Law § 2561, 2568. On the other hand, the statute also enumerates ways in which the state may "cooperat[e]" and "assist[ ]" the NYCCOC in the performance of its duties, *id.* § 2565, suggesting that the legislature considered the NYCCOC and the state to be distinct entities. The Court therefore concludes that the first *Mancuso* factor is neutral.

The second factor – how the entity's governing members are appointed – weighs squarely in favor of immunity. The NYCCOC's board of directors consists of thirteen people, seven of whom are appointed by the governor and six of whom are appointed by leaders of the legislature. *See id.* § 2562(1).

The third factor – how the entity is funded – also weighs neither for nor against immunity. The NYCCOC funds itself at least in part by collecting rents and other fees from the convention center's patrons. *See id.* § 2563(10). Addi-

tionally, the legislature has established a procedure through which it may appropriate supplemental funds to the NYCCOC to the extent that doing so is necessary to enable the NYCCOC to meet its operating expenses. *See id.* § 2566. Because there is no evidence in the record establishing the actual extent to which the NYCCOC is self-funded, the Court concludes that the third factor is neutral.

The fourth factor – whether the entity's function is traditionally one of state or local government – weighs against a finding of immunity. Unlike in *Mancuso*, which concerned the New York State Thruway Authority's operation of the state's highways and canals, it cannot be said that the operation of a convention center is traditionally a state function. Defendants have offered no evidence that any other states operate convention centers – much less that such is the tradition – and the Court suspects that many of the convention centers in this country are operated by municipal entities. Tellingly, the legislature's own findings and declarations in the statute creating the NYCCOC speak as much or more to the needs of New York City than they do to the needs of the state of New York. *See id.* § 2561. Accordingly, the Court concludes that the fourth *Mancuso* factor weighs against immunity.

The fifth factor – whether the state has veto power over the entity's actions – also weighs against a finding of immunity. To be sure, the chairman of the NYCCOC's board of directors serves at the pleasure of the governor, but only in his or her capacity as chairman. *See id.* § 2562(1). Although the governor has unfettered discretion to strip the chairman of his or her chairmanship, the governor cannot remove any of the board members (including the chairman) from the board except for cause. *See id.* § 2562(5). Moreover, while the

comptroller must approve any arrangement in which the center is rented out for purposes other than exhibition, no state official exercises any direct oversight over the NYCCOC with respect to its operation of the Javits Center as an exhibition facility. *See id.* § 2564(1). The Court therefore concludes that the fifth factor weighs against immunity.

Finally, the sixth factor – whether the entity's obligations are binding on the state – weighs heavily against immunity. The statute, after all, expressly provides that "[t]he obligations of the corporation shall not be debts of the state," that "the state shall not be liable thereon," and that "such obligations shall not be payable out of any funds other than those of the corporation." *Id.* § 2567. Defendants contend that this provision "is more theoretical than real" because, under section 2566, "the state has committed to compensate [the] NYCCOC for the expenses related to meeting its obligations." NYCCOC Mem. at 7. However, nothing in section 2566 (which provides that the state *"may"* appropriate supplemental funds to the NYCCOC) *requires* the state to give the NYCCOC any money, a point driven home by the powerful and unambiguous language in section 2567. The Court therefore concludes that the sixth factor weighs decidedly against immunity.

Turning then, as *Mancuso* instructs, to the twin purposes of the Eleventh Amendment – protecting states' treasuries and protecting their dignity – it is clear that the NYCCOC should not be deemed an "arm of the state" for Eleventh Amendment purposes. Given that the state plainly is not liable for the debts of the NYCCOC, nothing about this lawsuit renders the state's purse at all vulnerable, even though a judgment theoretically could make it more difficult for the NYCCOC to meet its operating expenses. Furthermore, because the state exercises only limited control over the NYCCOC, and because the Javits Center is not closely identified with the state, it cannot be said that this lawsuit in any way threatens the state's dignity.

Accordingly, the Court holds that the NYCCOC is not entitled to Eleventh Amendment immunity. *Accord Sacco v. Pataki*, 982 F.Supp. 231, 244–45 (S.D.N.Y. 1997).[2]

## B. NYSHRL and NYCCRL Claims

▮▮▮ Defendants next contend that plaintiffs' claims under the NYSHRL and the NYCCRL should be dismissed because they failed to serve the NYCCOC with the requisite notice of claim.[3] Defendants rely on section 2570 of the Public Authorities Law, which provides that:

A notice of claim, served in accordance with the provisions of section fifty-e of the general municipal law, shall be a condition precedent to the commencement of an action against the [NYCCOC], its directors, officers, employees or agents.

N.Y. Pub. Auth. Law § 2570. Section 50–e of the General Municipal Law in turn

---

**2.** Defendants' reliance on *Chafetz v. Roosevelt Island Operating Corp.*, No. 97 Civ. 0761, 2000 WL 1277337 (S.D.N.Y. Sep.8, 2000), is misplaced. In that case, the state was statutorily obligated to indemnify the Roosevelt Island Operating Corporation with respect to any judgment obtained, whereas here the state unquestionably cannot be held liable. Given that "the vulnerability of the State's purse [is] the most salient factor," *Mancuso*, 86 F.3d at 293, *Chafetz* is inapposite.

**3.** Federal courts are obligated to apply state notice of claim provisions to causes of action brought under state and local law, but not to causes of action brought under federal law. *See Felder v. Casey*, 487 U.S. 131, 141, 151, 108 S.Ct. 2302, 101 L.Ed.2d 123 (1988).

requires a plaintiff, in "any case founded upon tort," to serve a notice of claim upon a prospective municipal defendant no later than ninety days after the claim arises. N.Y. Gen. Mun. Law § 50–e(1)(a).

Plaintiffs respond by arguing that section 50–e does not apply to their discrimination claims because they are not, in the plain words of the statute, "founded upon tort." Strictly speaking, plaintiffs are correct. *See Mills v. County of Monroe*, 89 A.D.2d 776, 453 N.Y.S.2d 486 (N.Y.App. Div.1982) (holding that notice of claim provision in section 50–e does not apply to discrimination claims brought against municipal defendants under the Human Rights Law because they are not "tort" claims), *aff'd*, 59 N.Y.2d 307, 464 N.Y.S.2d 709, 451 N.E.2d 456 (1983); *see also Hamm v. New York City Office of the Comptroller*, No. 95 Civ. 6367, 1998 WL 92395, at *6 (S.D.N.Y. Mar. 4, 1998) (collecting cases). The question here, however, is not simply whether section 50–e applies of its own force, but rather whether its notice of claim requirement applies as incorporated through the broad language of section 2570 of the Public Authorities Law, which mandates without qualification that a notice of claim be filed as a condition precedent to "an action" – that is, *any* action – brought against the NYCCOC.

Though no cases are directly on point, courts have confronted a similar issue when applying section 52 of the County Law to discrimination claims brought against county entities. Section 52 requires a plaintiff to serve a prospective county defendant with a notice of claim "in compliance with section fifty-e of the general municipal law" as a condition precedent to bringing "[a]ny claim ... for damages arising at law or in equity." N.Y. County Law § 52. In *Mills, supra*, the New York Appellate Division held that even though section 50–e itself does not

apply to discrimination claims, and even though section 52 expressly incorporates section 50–e, the notice of claim requirement in section 52 nonetheless applies to discrimination claims against county entities because such claims plainly are encompassed by the broad statutory language "[a]ny claim ... for damages arising at law or in equity." *See Mills*, 453 N.Y.S.2d at 487. At least two federal district courts have drawn the same conclusion in light of the broad, unqualified language of section 52. *See Keating v. Gaffney*, No. 00 Civ. 5757, 2001 U.S. Dist. LEXIS 14637, at *35–*36 (E.D.N.Y. Sep. 12, 2001) (distinguishing between cases brought against county defendants and cases brought against municipal defendants "because N.Y. County Law § 52 is a much broader statute than General Municipal Law § 50–e"); *Pustilnik v. Hynes*, No. 99 Civ. 4087, 2000 WL 914629, at *7 (E.D.N.Y. Jun. 27, 2000) (same). This precedent strongly suggests that section 2570, which is even more broad than section 52, requires that a notice of claim be served before a discrimination suit may be filed against the NYCCOC.

Moreover, simple logic dictates that the legislature could not have intended section 2570 to incorporate section 50–e's substantive limitations on the notice of claim requirement. After all, whereas section 50–e provides that a notice of claim is *not* required in a suit brought solely against an employee of a municipal entity, *see* N.Y. Gen. Mun. Law § 50–e(1)(b), section 2570 plainly provides that a notice of claim *is* required in a suit brought solely against an employee of the NYCCOC. *See* N.Y. Pub. Auth. Law § 2570 ("A notice of claim ... shall be a condition precedent to the commencement of an action against the [NYCCOC], its directors, officers, employees or agents."). Because it cannot be that section 2570 both does and does not require a notice of claim in a suit against a NYC-

COC employee, the Court concludes that section 2570 incorporates section 50–e only with respect to the *procedure* required for serving a notice of claim. *See id.* ("A notice of claim, *served in accordance with* the provisions of section fifty-e of the general municipal law, shall be a condition precedent . . . .") (emphasis added).

Accordingly, plaintiffs' claims under the NYSHRL and the NYCCRL are DISMISSED.

## C. Equal Pay Act Claims

■■■ Defendants next argue that plaintiffs' complaint fails to state a claim for relief under the Equal Pay Act. The Equal Pay Act provides that an employer shall not:

> "discriminate . . . between employees on the basis of sex by paying wages to employees . . . at a rate less than the rate at which [it pays] wages to employees of the opposite sex . . . for equal work on jobs the performance of which requires equal skill, effort and responsibility, and which are performed under similar working conditions."

29 U.S.C. § 206(d). To state a prima facie case under the Equal Pay Act, a plaintiff must allege (1) that the employer paid different wages to employees of the opposite sex; (2) that the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (3) that the jobs are performed under similar working conditions. *See Tomka v. Seiler Corp.*, 66 F.3d 1295, 1310 (2d Cir.1995).

Plaintiffs' Equal Pay Act claim attacks the manner in which defendants allegedly mete out work assignments. Carpenters and freight handlers at the Javits Center are called to work each day on an as-needed basis, and plaintiffs claim that defendants assign more work to male employees than female employees on the basis of gender, thus resulting in a significant "salary differential" between men and women. *See* Compl. ¶¶ 171–193.

■■■ The Equal Pay Act is not violated, however, every time men are paid more than women *in the aggregate.* Under the plain language of the statute, the key is whether men and women are paid at the same "rate" and whether the work they are performing is "equal." Here, plaintiffs concede that male and female employees are paid at the same rate and, obviously, that those who are assigned fewer hours work less than those who are assigned more hours. The fact that male employees are offered more work than female employees may well constitute a violation of any number of federal and state employment discrimination statutes, but it simply cannot form the basis of an Equal Pay Act claim. *See True v. N.Y. State Dept. of Correctional Servs.*, 613 F.Supp. 27, 30–31 (W.D.N.Y.1984).

Accordingly, plaintiffs' Equal Pay Act claims are DISMISSED.

## D. Claims Under Section 1981 and Section 1983

■■■ Finally, defendants challenge plaintiffs' disparate treatment and hostile work environment claims under 42 U.S.C. § 1981 and 42 U.S.C. § 1983. Defendants argue that the complaint does not allege facts sufficient to state a cognizable claim for discrimination, harassment, or retaliation. At a minimum, defendants contend, plaintiffs should be required to furnish a more definite statement under Federal Rule of Civil Procedure 12(e).

The Court notes at the outset that nothing in the rules of civil procedure requires a complaint to allege facts sufficient, if proven, to prevail at trial. Because race and sex discrimination are "claim[s] upon which relief can be granted" within the meaning of Federal Rule of Civil Proce-

dure 12(b)(6), and because there are no heightened pleading standards governing such claims, plaintiffs are not necessarily required to allege any more than "I was turned down for the job because of my race" in order to survive a motion to dismiss. *See Bennett v. Schmidt,* 153 F.3d 516, 518 (7th Cir.1998).

The problem with plaintiffs' rambling forty-two page complaint, however, is that it does not give defendants even minimal notice of which plaintiffs are asserting which causes of action. The complaint asserts that plaintiffs were denied various privileges of employment because of their race and/or gender but does not specify which plaintiffs were denied which privileges. The complaint describes a general pattern of race and gender hostility but does not specify which plaintiffs are asserting hostile work environment claims based on which alleged incidents. The complaint alleges generally that management retaliated against plaintiffs for engaging in protected activity but does not specify which plaintiffs were retaliated against and for what protected activity. Without greater specificity regarding the alleged harm suffered by each plaintiff, it is impossible for defendants even to formulate an answer.

Accordingly, the Court GRANTS defendants' motion for a more definite statement under Rule 12(e). Plaintiffs shall file an amended complaint setting forth specific causes of action for each individual plaintiff. The amended complaint need not – an indeed should not – be overly detailed. *See* Fed.R.Civ.P. 8(e) (requiring pleading to be concise and direct).

However, the amended complaint must give defendants sufficient notice of which plaintiffs are asserting which claims, and it must provide a "short and plain statement" of the facts giving rise to each individual claim. *See* Fed.R.Civ.P. 8(a). Plaintiffs' amended complaint shall be filed no later than thirty days from the date of this opinion.[4]

---

4. Plaintiffs are reminded that their amended complaint must aver—briefly but clearly— that defendants McQueen and Powers were personally involved in the alleged discrimination in order to state a cognizable claim for relief against them. Personal involvement can come in the form of direct participation, the failure to remedy a known wrong, the creation of a discriminatory policy or custom, or gross negligence in the management of the subordinates responsible for the discrimination. *See Williams v. Smith,* 781 F.2d 319, 323–24 (2d Cir.1986).